SUR-GRO PLANT FOOD CO., INC., APPELLANT AND CROSS-APPELLEE, *v.* MORGAN ET AL., APPELLEES AND CROSS-APPELLANTS.

(Nos. CA84-02-017, -029 and -032 — Decided June 24, 1985.)

*Parrish, Beimford, Fryman, Smith, Uhl & Lierman* and *Robert E. Fryman,* for appellant and cross-appellee.

*Holbrock, Jonson, Bressler & Houser, John T. Willard;* and *Al Edmunds,* for appellees and cross-appellants.

JONES, J. Plaintiff, Sur-Gro Plant Food Company, Inc. ("Sur-Gro"), a corporation located in Plattsburg, Missouri, is engaged in the business of selling agricultural fertilizers, crop chemicals, and crop seeds. Sur-Gro owned a plant located in Maysville, Missouri, which was operated by defendant Fred Morgan through his business known as Ag-Service Center, pursuant to an agency contract with Sur-Gro. According to the agency contract, Sur-Gro provided the inventory for the operation, supplying Ag-Service Center with seeds, fertilizer and agricultural chemicals. Fred Morgan and Ag-Service Center conducted sales of the products and turned the proceeds over to Sur-Gro. Based on monthly statements provided by Ag-Service Center, Sur-Gro in turn paid Morgan's business a monthly commission. Morgan

received a certain percentage of the fertilizer, chemical and seed sales and retained one hundred percent of all fees which were charged for the spreading of fertilizer or chemicals. In 1976, Ron Freeman, an office manager and bookkeeper for Sur-Gro, conducted an audit of the Maysville plant's customer accounts. Freeman's audit revealed that Fred Morgan had failed to turn over money to Sur-Gro which had been paid to Ag-Service Center by several customers who had purchased chemicals or fertilizers from Sur-Gro. In addition, there were discrepancies in several of the accounts which indicated that some customers had been improperly billed for chemicals or fertilizer which they had not received and that other customers had returned chemicals or fertilizers and were not given a proper credit. Freeman determined that a total of $23,166 in sales proceeds had been improperly withheld from Sur-Gro. Freeman informed Fred Morgan that the deficit would have to be paid to Sur-Gro, whereupon Morgan offered to contact his father to determine whether his parents would either loan him the money to pay the debt or otherwise provide some form of security to Sur-Gro. Fred Morgan later informed Freeman that Morgan's parents had agreed to give Sur-Gro a $24,000 mortgage on their Hamilton, Ohio residence.

On April 5, 1976, Freeman traveled to Hamilton, where he met Fred Morgan's parents, defendants Harry and Bertha Morgan, at the office of a local attorney whom Freeman had retained to draft the mortgage and accompanying promissory note. At this point, the parties offer different versions of the events immediately preceding the execution of the promissory note and mortgage by Harry and Bertha Morgan. According to Freeman, he never informed the Morgans of the reason for the note and mortgage because Fred Morgan had requested that Freeman refrain from discussing with the Morgans the exact details of Fred's business relationship with Sur-Gro. However, Freeman testified that the Morgans were aware of their son's pre-existing debt to Sur-Gro. Freeman claimed that he never told the Morgans that the note was in exchange for future advancements of funds that Sur-Gro was going to make to Fred. Freeman also denied that he told the Morgans that their son would sign the note after Freeman returned to Missouri. According to Freeman, the attorney explained the note to the Morgans after which the Morgans requested that a provision providing that the mortgage could not be foreclosed for five years be inserted prior to their signing.

Bertha Morgan testified that she and her husband went to the attorney's office to sign the note where she met Freeman for the first time. Bertha Morgan claimed that Freeman informed them that Fred was going to go into business with Sur-Gro but lacked the necessary capital to do so, and that the mortgage was being used to provide future advances of capital to Fred so that he could go into business. Mrs. Morgan recalled that her husband stated that the money was only to be used to help Fred go into business and that the mortgage proceeds should not be used to pay off Fred's existing debts or liabilities. Bertha Morgan claimed that she was prevented from reading the note and mortgage by Freeman's constant interruptions, which included statements by Freeman that Fred would sign the note, make the payments, and that the Morgans would not have anything to worry about. Mrs. Morgan could not recall, however, whether her husband read the note and mortgage before signing it. She claimed that she and her husband requested the provision prohibiting foreclosure for five years after Freeman informed them that it would take Fred approximately that amount of time to pay off the note.

Robert Bartels was the attorney who prepared the note and mortgage for the Morgans' signatures. He stated that he explained the terms and conditions of the note and mortgage to the Morgans, including the amount of money involved, the payments, and the nature of the security that was being given. Bartels asked the Morgans what they were getting out of the transaction and Harry Morgan replied that they were "helping his boy out." When Bartels asked who was going to make the note payments, Harry Morgan replied that his son was going to pay off the note. When Bartels explained that the mortgage could be foreclosed if the Morgans' son failed to make the note payments, Bartels stated that the Morgans were reluctant to sign and insisted that the provision prohibiting foreclosure for a five-year period be inserted into the note. Bartels stated that he could not recall whether Freeman interfered with the Morgans when they tried to read the note and was also unable to recall whether Freeman told the Morgans that the note was to cover future advances made to their son and whether Fred Morgan would also sign the note on the additional signature line.[1] Bartels stated, however, that the importance of making payments on the note was impressed upon the Morgans.

The record indicates that Harry and Bertha Morgan never made any payments on the note. The only payment on the note, one for $2,000, was made by Douglas Morgan, the son of Harry and Bertha Morgan and Fred Morgan's brother.[2] Douglas Morgan testified that he made the payment on his parents' note after he was contacted by Freeman who stated that the note and mortage were delinquent. Douglas Morgan also stated that his father felt that the payment should not have been made since Fred never received any money from Sur-Gro as a result of the mortgage and that the transaction as a whole was a bad deal.

On August 17, 1981, Sur-Gro filed a complaint in the Court of Common Pleas of Butler County against Harry and Bertha Morgan to foreclose the mortgage and collect the amount due and owing on the note. On October 30, the court granted Harry and Bertha Morgan's motion to join Fred Morgan as a party defendant. Harry and Bertha Morgan filed a counterclaim against Sur-Gro alleging that they had been fraudulently induced to sign the note and mortgage and that Sur-Gro was guilty of violating federal Truth in Lending laws in securing their signatures on the note. They also filed a cross-claim against their son Fred claiming that they were entitled to indemnification in the event Sur-Gro obtained judgment against them. Thereafter, Fred Morgan filed a counterclaim against Sur-Gro, seeking to recover over $21,000 in commissions which Fred Morgan claimed had never been paid to him.

On March 30, 1983, while the matter was still pending before the common

---

[1] The note in question was written on a standard installment note form produced and sold by a legal publishing company. This particular form contained three signature lines where the maker(s) could sign. Counsel for Bertha Morgan claims that the three lines reflect an intent on the part of the parties that a third maker, *i.e.,* Fred Morgan, was to sign the note. The use of a pre-printed standard note form containing a specific number of signature lines is not, in and of itself, evidence that the parties to the note intended that a number of co-makers equal to the number of signature lines printed on the form were to sign the note.

[2] Jim Rakestraw, Sur-Gro's general manager, testified that a $100 credit, representing payment which Sur-Gro had received on an account receivable that had been charged to Fred Morgan, was also applied against the balance of the note.

pleas court, Harry Morgan died, whereupon counsel for Harry and Bertha Morgan filed a notice of Harry Morgan's death. On September 22, 1983, an entry of substitution was journalized, substituting Bertha Morgan as a defendant for Harry Morgan.[3]

A bench trial was conducted on the various claims and on January 6, 1984, the trial court rendered its decision in which it held, *inter alia*, that no consideration was given for the note and mortgage signed by Harry and Bertha Morgan. The trial court's opinion went on to state that:

"* * * Part of this transaction and part of the consideration was the signing of the note by their son which was not done. * * * Under the circumstances in this case, it appears more probable that the parties intended that Fred Morgan sign the note. This seems the only logical conclusion when you consider that Harry and Bertha Morgan received nothing in this transaction. * * * They relied upon the fact that their son would sign the note and his failure to do so, substantially effects [*sic*] their right of indemnity."

The trial court also determined that Sur-Gro was entitled to recover the amount alleged to be owed by Fred Morgan and awarded Sur-Gro judgment for $24,000. The court finally stated that:

"* * * none of the Defendants have [*sic*] proven their counterclaims or crossclaims [*sic*] by a preponderance thereon."

Sur-Gro has appealed that portion of the decision and judgment entry granting judgment to Harry and Bertha Morgan with regard to the promissory note and mortgage. Cross-appeals have been filed by both Fred Morgan and Harry and Bertha Morgan, and the various matters were consolidated for review.

* * *

In their cross-appeal Harry and Bertha Morgan raise one assignment of error which claims that the trial court erred in dismissing their counterclaim against Sur-Gro. * * *

In further support of their contention that the trial court erred in dismissing their counterclaim, the Morgans allege that Sur-Gro's actions amounted to violations of the Federal Truth in Lending and Fair Credit Billing Acts, Section 1601 *et seq.*, Title 15, U.S. Code, and more specifically Regulation Z, Section 226.1 *et seq.*, Title 12, C.F.R.

The purpose of Regulation Z is to "promote the informed use of consumer credit by requiring disclosures about its terms and cost." Section 226.1(b), Title 12, C.F.R. See, also, *Pearson* v. *Easy Living, Inc.* (S.D. Ohio 1981), 534 F.Supp. 884; *Easy Living* v. *Whitehead* (1979), 65 Ohio App. 2d 206 [16 O.O. 3d 155]. The federal laws and the accompanying regulations apply to those situations where: (1) "[t]he credit is offered or extended to consumers"; (2) the extension of credit is done on a regular basis; (3) "the credit is subject to a finance charge or is payable by a written agreement in more than 4 installments"; and (4) "the credit is primarily for personal, family, or household purposes." Section 226.1(c), Title 12, C.F.R. Ac-

---

[3] The court found that title to the mortgaged property had passed to Bertha Morgan by way of a survivorship deed and that Bertha Morgan was the sole owner of the property. The court also found that all of Harry Morgan's assets were held jointly with a right of survivorship in his surviving spouse and that Bertha Morgan had been named as executrix in her husband's will. Counsel for Bertha Morgan objected to the entry of substitution on the basis that although Harry Morgan's will had been filed with the probate court, no application to probate the will had been filed and Bertha Morgan had not been formally appointed as the executrix of her husband's estate.

128

cordingly, the application of the acts and regulations are triggered by the extension or arrangement of credit to a consumer by a provider of consumer goods or services. *McCracken* v. *Hammon* (May 31, 1984), Clermont App. No. CA83-08-067, unreported. Regulation Z defines "credit" as "the right to defer payment of debt or to incur debt and defer its payment." Section 226.2(a)(14), Title 12, C.F.R.

In the case at bar, there was an arrangement or extension of credit, *i.e.,* the right to defer the payment of a debt. Cf. *McCracken, supra* (there was no indicia that credit as defined within Regulation Z was provided or extended to a consumer). Even though credit may have been extended in the case at bar, such credit does not meet the requirements necessary to bring it within the scope of Regulation Z. The credit must be extended to a consumer. In other words, the credit must be for personal, family or household purposes. Here, any credit which was offered had its origin in the business relation between Fred Morgan and Sur-Gro. The credit was offered in order to defer payment of a business' debt which Fred Morgan had incurred. The debt had been incurred by Fred Morgan as a result of his business relationship with Sur-Gro and the note and mortgage given by his parents were to defer payment on that business debt. Credit which is given for business, commercial, or agricultural purposes is specifically exempted from the coverage of Regulation Z. Section 226.3(a)(1), Title 23, C.F.R. Also, in an extension of credit for business purposes, the fact that a party signing the note to secure the credit was not involved in the business relationship will not bring the transaction within the purview of the Truth in Lending Act. See *Morse* v. *Mutual Federal S. & L. Assn. of Whitman* (D. Mass. 1982), 536 F. Supp. 1271.

Furthermore, there has been no showing in the immediate case that this credit was offered by Sur-Gro on a regular basis. Regulation Z covers credit which is extended on a regular basis. The regulation requires that credit involving transactions secured by a dwelling be extended more than five times in either the preceding calendar year, or in the current calendar year if such is not done for the preceding year. Section 226.2(a)(17)(i), fn. 3, Title 12, C.F.R. There has been no showing in the record that Sur-Gro extended credit of this nature more than five times either during the current calendar year or the preceding calendar year. Absent a regular extention of credit, the Truth in Lending Act and Regulation Z do not apply. See *McCracken, supra.* Accordingly, the trial court did not err in refusing to grant the Morgans judgment on their counterclaim on the basis of Regulation Z.

* * *

For the sole assignment of error in its appeal, Sur-Gro asserts the following:

"The ruling of the trial court that the note and mortgage given by Harry E. Morgan and Bertha A. Morgan to Sur-Gro Plant Food Co., Inc. was without consideration and thus void, is contrary to law."

The trial court determined that Sur-Gro was not entitled to recover on the note or foreclose the mortgage since no consideration had been given in exchange for the instruments. The court found that Fred Morgan's signing of the note was to be part of the consideration given in exchange thereof. The court then established that it appeared that the parties intended for Fred Morgan to sign the note, basing its conclusion on the fact that the Morgans received nothing in the transaction. However, the court also determined, and we have affirmed the same, that Fred Morgan was obligated to Sur-Gro for $24,000.

The Morgans admitted that they had signed and executed the note and mort-

gage. While the trial court may have been correct in determining that the absence of Fred Morgan's signature substantially affected Harry and Bertha Morgan's right of indemnification, the absence of their son's signature does not affect their obligation as makers of the note. Where the signatures on a note are admitted, the production of the instrument entitles the holder to recover unless a defense is established. R.C. 1303.36(B); *Mercantile Bldg. & Loan Co. v. Gampher* (Mar. 29, 1984), Brown App. No. CA83-08-009, unreported. See, also, *J.M. Tull Industries, Inc. v. Reed* (1981), 160 Ga. App. 89, 286 S.E. 2d 325; *Smith v. Gentilotti* (1977), 371 Mass. 839, 359 N.E.2d 953; and *Newman Grove Creamery Co. v. Deaver* (1981), 208 Neb. 178, 302 N.W.2d 697. In the matter *sub judice,* the defense asserted is that of lack of consideration. A signed note constitutes *prima facie* evidence of the amount due, and a claim of a lack of consideration for such note is an affirmative defense which must be proved by a preponderance of the evidence. *Riegert v. Weatherholt* (Nov. 21, 1983), Butler App. No. CA82-10-0099, unreported. See, also, *First Natl. Bank of Elgin v. Achilli* (1973), 14 Ill. App. 3d 1, 301 N.E.2d 739; and *Rago v. Cosmopolitan Natl. Bank* (1967), 89 Ill. App. 2d 12, 232 N.E.2d 88.

The finding of a lack of consideration by the trial court was based, in part, upon its finding that the Morgans had received nothing in the transaction. We have previously held that:

"Valuable consideration within the contractual relationship created by a promissory note may consist of a benefit to the promisor or a loss or detriment to the promisee. * * * This principle is applicable in a situation where an individual executes a note, payable to another party, for and in behalf of a third party who receives the actual benefit from the payee.* * *" (Citations omitted.) *Eaton Natl. Bank & Trust Co.*

v. *Harmon* (Dec. 5, 1983), Preble App. No. CA83-03-007, unreported, at page 10. Furthermore, in *Klamo v. Hobbs* (Aug. 10, 1983), Butler App. No. CA83-02-019, unreported, we held that the promise of one party to forbear from prosecuting or pursuing the legal right to collect a debt which is due and owing is sufficient consideration given in exchange for a promissory note. Such is the situation that was done here, with Sur-Gro agreeing to forbear from collecting the debt owed by Fred Morgan in exchange for the note and mortgage given by Harry and Bertha Morgan.

R.C. 1303.44, dealing with consideration, states that:

"Want or failure of consideration is a defense as against any person not having the rights of a holder in due course, as provided in section 1303.34 of the Revised Code, except that no consideration is necessary for an instrument or obligation thereon given in payment of or as security for an antecedent obligation of any kind. * * *"

The Official Comment to R.C. 1303.44 specifically provides that where an instrument is given in payment of or as security for an antecedent obligation, the antecedent debt may be an existing obligation already owed by the party giving the instrument, or may be a debt owed by a third person. Other jurisdictions which have adopted statutory provisions similar to R.C. 1303.44 have held that no consideration for a promissory note is necessary to establish a valid obligation as between the maker of the note and the payee where the note was given as security for the antecedent debt or obligation of a third party. *Chaffin v. Hall* (Ala. 1983), 439 So.2d 67; *Kitzer v. Kitzer* (1974), 20 Ill. App. 3d 54, 312 N.E.2d 699; *Musulin v. Woodtek, Inc.* (1971), 260 Ore. 576, 491 P.2d 1173; *A.M. Castle & Co. v. Bagley* (1970), 24 Utah 2d 136, 467 P.2d 408; *First Natl. Bank of Elgin, supra;* and *Newman Grove Creamery Co., supra.* See,

also, *Austrian, Lance & Stewart, P.C.* v. *Hastings Properties, Inc.* (1976), 87 Misc. 2d 25, 385 N.Y. Supp. 2d 466 (legal services rendered for the benefit of a third party for which a note is executed by a maker in consideration thereof constitutes a valid antecedent debt upon which the payee may successfully sue the maker as if the payee were a holder in due course).[4]

We find that the note and mortgage executed by Harry and Bertha Morgan were given in exchange for the antecedent debt of their son, Fred Morgan. As such, there was sufficient consideration for the instrument. While the parties may have contemplated that Fred Morgan would also sign the note, the absence of his signature does not affect his parents' obligation as makers of the note. The fact that the Morgans did not receive any actual proceeds from the transaction does not invalidate the note for want of consideration. In accepting the note from the Morgans, Sur-Gro agreed to forbear from initiating an action against Fred Morgan to collect on the debt which he owed to Sur-Gro. Fred Morgan received the primary benefit of the transaction by receiving an extension on the payment of his obligation. There was ample and sufficient consideration for the promissory note, albeit the absence of Fred Morgan's signature from the note. The assignment of error raised by Sur-Gro is well-taken and is hereby sustained.

The judgment of the trial court is hereby reversed in part and affirmed in part.

*Judgment accordingly.*

[4] This principle has also been applied to parties other than the maker of a note. See, *e.g., State Bank of Greeley* v. *Owens* (1972), 31 Colo. App. 351, 502 P.2d 965; *Hurt* v. *Citizens Trust Co.* (1973), 128 Ga. App. 224, 196 S.E.2d 349; *J.M. Tull Industries, Inc., supra.*

KOEHLER, P.J., and CASTLE, J., concur.

CASTLE, J., retired, of the Twelfth Appellate District, was assigned to active duty pursuant to Section 6(C), Article IV, Constitution.