In re LAMICA CORPORATION, Debtor.

Bankruptcy No. 85 B 20547.

United States Bankruptcy Court, S.D. New York.

Sept. 29, 1986.

Jeffrey L. Sapir, Hartsdale, N.Y., for debtor, Lamica Corp.

Bernard Gordon and Marvin Gordon, Individually and d/b/a BHM Metal Products, pro se.

## DECISION ON MOTION FOR AN ORDER EXPUNGING CLAIM OF BHM METAL PRODUCTS

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The debtor in possession in this Chapter 11 case, moved to reduce the $68,215.26 proof of claim filed by Bernard Gordon and Marvin Gordon, individually and doing business as BHM Metal Products Company ("BHM"). The debtor contends that BHM failed to deliver on time certain metal frames and tubes pursuant to a written contract between the parties, with the result that the debtor was penalized under a contract it had with its customer, who in turn had contracted to sell children's table desks to a school board.

### FINDINGS OF FACT

1. The debtor, Lamica Corporation, filed with this court its petition for reorganizational relief under Chapter 11 of the Bankruptcy Code on November 20, 1985 and was continued in possession and authorized to operate its business pursuant to 11 U.S.C. §§ 1107 and 1108. The debtor is located in Hillburn, New York and is engaged in the business of manufacturing formica office furniture.

2. The creditor, BHM Metal Products Company, is a partnership whose premises are located in Sullivan County, New York and is engaged in the business of manufacturing and selling metal products.

3. On August 4, 1984, Messrs. Bob and Jim Gordon, representatives of BHM visited the office of Paul Richard, president of the debtor. BHM had previously done business with the debtor. Mr. Richard informed BHM's representatives that the debtor had entered into a contract in May of 1984 with another supplier for the purchase of metal frames and tubes which were required by the debtor in order to satisfy a contract it had which called for delivery by August 27, 1984. Mr. Richard informed the BHM representatives that its supplier could not meet the delivery date and that other suppliers were unable to step in and meet the August 27th deadline. The BHM representatives assured Mr. Richard that BHM could satisfy the debtor's requirements. Mr. Richard testified that he told the BHM representatives that time was of the essence because the debtor had agreed to furnish formica table tops to a customer who, in turn, had agreed to sell children's tables for use as desks to a school board. The debtor's customer was threatening to pass on to the debtor any liquidated damages that the customer might be assessed by the school board.

4. The debtor's president informed BHM's representatives as to the details of the contract which the debtor's supplier had failed to meet, including unit prices

and quantities. Mr. Richard prepared a handwritten purchase order (Exhibit 1) which divided the units ordered into three priorities; Priority #1 was stated as "Need by 8/8/84;" Priority #2 contained items that were captioned as "Need By 8/10/84 or ASAP." The term "ASAP" meant as soon as possible. Priority #3, which comprised most of ordered products, stated: "Need By ASAP At Job Site, Farragut, TN." The handwritten order contained four columns entitled "Quant", "P/N", "Descrip." and "Price." All of the columns were followed by a listing of items, except that the "Price" column was originally blank. The prices that the debtor was to pay for the various units listed in the contract with the debtor's previous supplier were to be forwarded to BHM at a later date.

5. The debtor's president, Paul Richard, testified with respect to the August 4, 1984 meeting with the BHM representatives that: "We informed them of what the unit prices were we were currently paying for those parts at which time they agreed to produce them for those prices."[1] Mr. Richard testified that the total price for the merchandise, as specified in the contract with the previous supplier was $22,631, which BHM's representatives agreed to meet.

6. A formal purchase order was not prepared on August 4, 1984. BHM failed to make the first priority delivery on August 8, 1984, as specified on the handwritten order, although this was the date picked by the debtor's customer for assembling the products at the job site. The debtor's president personally visited the BHM premises on August 11, 1984 and was informed that the materials had not yet arrived and that BHM was trying to get them from their suppliers.

7. Following his visit to the BHM premises, the debtor's president addressed a handwritten note to his office manager to prepare a typed formal purchase order re-flecting the information contained in the handwritten purchase order dated August 4, 1984, which should indicate that the delivery requirement for the total order was August 27, 1984. This note reads as follows:

Mark

Please issue purchase orders to B.H.M. for the metal parts as per the attached. Date of P.O. 8/4/84

Indicate Confirmation of orders placed w/ Bob & Jim Gordon in person on this day by P.E.R.

Indicate delivery requirement of 8/27/84. (total).

Delivery date approved by both of the above to me on 8/4/84 and again to me during visit to plant on 8/11/84.

Indicate paint finish (Polane).

(Polane)

(Exhibit 1).

8. On August 14, 1984, BHM's representative visited the debtor's premises and picked up a $4000 check as a deposit towards the contract between the parties.

9. On August 20, 1984, the debtor typed and mailed to BHM a formal purchase order which specified the three priority delivery requirements and stating that metal products had to be shipped "By 8/27/84 (Total)". (Exhibit 1). The number of units of each item was listed on the order, but no prices were typed in the "Unit Price" column. The typed notes at the bottom of the order stated:

NOTES:

1/ Above is confirmation of orders placed with Bob & Jim Gordon in person on 8/20/84 by Paul Richard. (Cont'd) . . . 8/4/84

NOTES (Cont'd):

2/ Deliver requirement: 8/27/84 (TOTAL) (Delivery date approved by both gentlemen (Bob & Jim Gordon) to me on 8/4/84 and again to me during visit to plant on 8/11/84.)

3/ Paint Finish: POLANE

4/ Deposit payment of $4000.00 made on 8/14/84 (Check #0627).

---

1. The proceedings were electronically transcribed pursuant to Bankruptcy Rule 5007. All quotations of testimony were derived from playing back the tapes of the proceedings and are not cited to by page number. *See* Bankruptcy Rule 5007(c).

10. A copy of the handwritten order dated August 4, 1984, which was attached to a copy of the purchase order typed on August 20, 1984, was introduced in evidence by the debtor as Exhibit # 1. The column marked "Price" on the handwritten order contained a list of prices for each unit ordered. As in the case of the handwritten order dated August 4, 1984, the column entitled "Unit Price" on the debtor's purchase order that was typed on August 20, 1984 did not list any prices for the various units. The debtor's president testified that these price figures were accumulated later by the debtor for BHM at the latter's request.

11. The August 27, 1984 delivery deadline came and went without any shipments by BHM as required under the purchase order. BHM made its first shipment to the debtor on September 10, 1984 of the items referred to in the purchase order's "# 1 Priority" that were described as "Need By 8/8/84." The chemically resistant black paint was tacky and unacceptable to the debtor because BHM was not familiar with the type of paint catalyst required to be used with the "Polane" paint finish specified in the order. BHM's principal, Bernard Gordon, testified that the debtor did not state which catalyst should be used and that BHM finally obtained the proper catalyst after the first shipment.

12. BHM continued to make additional shipments to the debtor on September 21, 24, 25, 26, 27, 28, October 1, 2, and 3. (Exhibit B). The items shipped by BHM were unpainted. In order to avoid additional charge-backs imposed by its customer, the debtor notified BHM that it would touch up the tacky items from the first shipment and would paint all of the unpainted items delivered by BHM. BHM turned over to the debtor all the paint it had purchased to be used for this purpose. Although the debtor was not geared for painting operations, it undertook this task by converting its laminating section into a paint shop and purchasing some additional paint and equipment needed for the task. The debtor's employees expended 407.2 man-hours, at $13.34 per hour, to paint the

items delivered by BHM, for a total cost of $11,047.15. (Exhibit # 2).

13. The debtor mailed an invoice to BHM in the sum of $11,047.15 enclosed in its letter dated October 24, 1984, (Exhibit # 2), which reads as follows:

BHM METAL PRODUCTS COMPANY
Box 76
Mongaup Valley, NY 12762

Attn: Messrs. Robert & James Gordon
Ref: P.O. No. 7706-7792
Gentlemen:

Attached please find our Invoice # 8569 dated 10/22/84, which covers spray painting of table frames you furnished our company unpainted. Above invoicing is as per letter of October 1, 1984 to BHM (copy attached). Total cost for these services in painting these items is $11,047.15.

Please advise whether you wish to render payment in this amount or whether we should proceed to deduct this from your payment for steel parts when received.

Very truly yours,
LAMICA CORPORATION
s/ Paul E. Richard
Paul E. Richard
President
PER/ckh
Attachments

14. The debtor's president testified that its customer paid for the finished products which the debtor belatedly delivered to the job site, but that the customer imposed liquidated damage penalties for late deliveries. Additionally, the debtor's president testified that as a result of the delays in delivery, the debtor lost a valued customer which had produced approximately $200,000 in business each year.

15. Robert Gordon, who represented BHM on August 4, 1984 when the original handwritten order was given, testified that BHM did not agree to meet the August 27th deadline. He said he advised the debtor's president that BHM would be able to do the job, although it was a very difficult

specialty type of job and that BHM would try to complete it as soon as possible. He admitted that BHM never forwarded an invoice to the debtor for the items which it sold and shipped to the debtor. Robert Gordon said that "we agreed to keep it as loose as possible" and that "we negotiate the price after the job is done."

16. Negotiations concerning the disputed sale ensued between BHM and the debtor in October of 1984 without any successful resolution. Some time in December of 1984 BHM instructed its attorney to commence a lawsuit to recover for the items sold and delivered to the debtor. In the course of an action commenced by BHM against the debtor in the Supreme Court of the State of New York, Sullivan County, BHM provided a Bill of Particulars, dated July 12, 1985, which stated that the job was to be billed on the basis of hours plus materials plus a fair markup for profit. BHM sought to recover $68,215.26, which included a claim for 2330 man-hours at $25 per hour. BHM asserted that the order in question called for the work to be completed as soon as possible, and shipped as and when and during the course of completion.

17. BHM's contention that its contract with the debtor did not call for a binding delivery deadline by August 27, 1984 is clearly refuted by the specific provisions in the handwritten purchase order dated August 4, 1984, which were incorporated in the purchase order typed on August 20, 1984. Three priority delivery dates were expressed; the first by August 8, 1984; the second by August 10, 1984 and the total balance of the contract had to be shipped by August 27, 1984.

18. BHM failed to comply with the purchase order in three important respects. First, it failed to deliver the merchandise by August 27, 1984, as required. Second, the paint on the first shipment was tacky and improper due to the use of the wrong paint catalyst. Third, the items delivered to the debtor after the first shipment were unpainted with the result that the debtor had to touch up the tacky paint involved in the first shipment and completely paint the items in the subsequent shipments in order to fulfill the debtor's commitment with its customer.

19. The debtor's efforts to rectify the tacky paint problem and to paint the unpainted table frames belatedly shipped by BHM were proper and reasonable in the circumstances. The debtor was not equipped to paint the metal products and might have incurred more start-up costs than would have been encountered by a manufacturer whose business it was to process and paint such items. However, the debtor was confronted with an emergency situation where it could not reject the unpainted table frames because the debtor's customer was threatening to pass on liquidated damage penalties for late deliveries to the job site. Therefore, the debtor chose to abate the delay and to cover its contractual exposure by converting its glue and lamination unit to a paint shop and assigning its own employees to paint the metal frames. The debtor's best efforts to mitigate damages were entirely proper.

20. The debtor's evidence established that it reasonably incurred expenses totalling $11,047.15 in order to touch up the tacky paint on the items included in BHM's first shipment and to paint the unpainted metal frames and tubes that were subsequently delivered by BHM. This expense should be deducted from the debtor's obligation to pay BHM for the merchandise which BHM sold and belatedly delivered to the debtor.

21. The debtor has established by a preponderance of the evidence that BHM agreed to meet the unit prices for metal frames and tubes which BHM currently paid for such items, as specified in the contract with the debtor's previous supplier, and which totalled $22,631 for the items in question. The handwritten purchase order dated August 4, 1984 and the printed order form which was typed on August 20, 1984 establish that the debtor agreed to pay for the items on the basis of a unit price for each item and not on the basis of hours plus materials plus a fair markup for

profit, as claimed by BHM. There was no credible proof to support BHM's position that the parties agreed to negotiate the price after the job was done. The unit prices which the debtor inserted under the column marked "Price" on the handwritten purchase order dated August 4, 1984, when totalled up, amount to $22,631, which is the contract price for the same items that the debtor's previous supplier would have charged had it been able to ship the merchandise. BHM's representatives said they could meet the terms of the debtor's contract with its previous supplier.

22. BHM is entitled to an allowed proof of claim which should reflect a contract price of $22,631, less $4000 paid by the debtor as a deposit, and less expenses in the sum of $11,047.15 which were incurred by the debtor in order to paint the metal frames so as to satisfy BHM's obligations under the sales contract between the parties. The net amount to which BHM is entitled under its proof of claim is $7583.85.

## DISCUSSION

■ The debtor's objection to BHM's claim in the sum of $68,215.26 for goods sold and delivered to the debtor must be viewed in the context of Bankruptcy Rule 3001(f) which accords *prima facie* validity to a properly filed proof of claim. Therefore, the debtor must go forward and produce sufficient evidence to rebut the claimant's *prima facie* case. If the debtor's evidence rebuts the *prima facie* validity of BHM's proof of claim, the burden of producing evidence shifts to BHM to prove its claim, not for the debtor to disprove it, because BHM, as the claimant, must bear the burden of persuasion to prove the validity of its claim by a preponderance of the evidence. *In re Horizon Machine & Engineering Corp.,* 54 B.R. 669 (Bankr.N.D.Ill. 1985); *In re Wells,* 51 B.R. 563 (Bankr.Col. 1985); *In re Anchorage Boat Sales, Inc.,* 29 B.R. 275 (Bankr.E.D.N.Y.(1983). *See also In re Avien, Inc.,* 390 F.Supp. 1335 (E.D.N.Y.1975) *aff'd* 532 F.2d 273 (2d Cir. 1976); *In re Gorgeous Blouse Co., Inc.,*

106 F.Supp. 465 (S.D.N.Y.1952); *In re George Jensen, Inc.,* 1 B.R. 239 (Bankr.S. D.N.Y.1979) (Act cases).

■ The handwritten purchase order dated August 4, 1984 and the printed purchase order typed August 20, 1984, clearly reflect that the total price for the items in question was calculated on a unit price for each item and not on the basis of hours plus materials plus a fair markup for profit, as claimed by BHM. The debtor also established that August 27, 1984 was a deadline date for BHM's delivery of the merchandise and that BHM belatedly delivered improperly painted and unpainted merchandise which the debtor had to touch up and paint at a cost of $11,047.15 in order to comply with the quality called for under the contract of sale.

■ Although the handwritten purchase order dated August 4, 1984 and the printed order typed on August 20, 1984 do not list the unit price for each item, this information was supplemented by the debtor's president's testimony that BHM agreed to meet the prices charged by the debtor's previous supplier for the same items, which totalled $22,631. Parol evidence of consistent additional terms may supplement an otherwise incomplete document. Section 2–202 of the New York Uniform Commercial Code (McKinney's 1986) codifies this parol evidence rule as it applies to contracts of sale and provides:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented.
>
> \*       \*       \*       \*       \*       \*
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

The unit prices which the debtor filled in under the column marked "Price" on the handwritten purchase order and which the debtor subsequently furnished to BHM, together with the testimony of the debtor's president that BHM's representatives agreed on August 4, 1984 to meet these unit prices, were properly introduced as consistent additional terms to supplement the handwritten and typed purchase orders. *Computerized Radiological Services, Inc., v. Syntex Corporation,* 595 F.Supp., 1495, 1505–1506 (E.D.N.Y.1984); *Rodman v. N & A Goldman Co., Inc. (In re W.T. Grant Co.),* 1 B.R. 516, 518–519 (S.D.N.Y.1979).

In rebutting the *prima facie* validity of BHM's claim for $68,215.26 and establishing a total sales price of $22,631 based on unit price terms, the debtor also admitted that it accepted the merchandise items which BHM shipped to it. However, the debtor contends that it accepted non-conforming metal frames and tubes which were either improperly painted or not painted at all. Thus, the debtor seeks to offset against the sales price the expenses of $11,047.15 incurred in touching up and painting the non-conforming merchandise. In this respect the debtor may look to Section 2–714(1) of the New York Uniform Commercial Code (McKinney's 1986), which provides:

> (1) Where the buyer has accepted goods and given notification (subsection (3) of Section 2—607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

Official Comment 2 to N.Y.U.C.C. § 2–714(1) sheds further light on the interpretation of this section and states:

> 2. The "non-conformity" referred to in subsection (1) includes not only breaches of warranties but also any failure of the seller to perform according to his obligations under the contract. In the case of such non-conformity, the buyer is permitted to recover for his loss "in any manner which is reasonable."

A purchaser's cost to repair non-conforming merchandise which it accepted under a sales contract is an appropriate measure of damages which meets the ultimate requirements of the contract by converting non-conforming goods into goods which will comply with the contract. *The City of New York v. Pullman Incorporated,* 662 F.2d 910 at 917–918 (2d Cir.1981) *cert. denied* 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); J. White & R. Summers, Handbook of the law under the Uniform Commercial Code, § 10–2 (2d ed. 1980). Hence, the debtor's reasonable efforts to touch up and paint the non-conforming metal items which the debtor accepted from BHM may be deducted from the purchase price.

BHM failed to sustain its burden of persuasion by a preponderance of the evidence that the parties agreed to negotiate the price for the merchandise sold after the contract was completed. There was also no credible proof that the parties agreed to a sale of the merchandise on the basis of hours plus materials plus fair markup for profit as claimed by BHM. Therefore, BHM's proof of claim for $68,215.26 must be reduced. The evidence in this case supports a purchase price of $22,631, minus a $4000 deposit paid by the debtor and less the expenses of $11,047.15 incurred by the debtor to convert the accepted non-conforming items into merchandise which complied with the contract.

## CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter and the persons in this matter in accordance with 28 U.S.C. § 1334 and 28 U.S.C. § 157(a). This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(B).

2. The debtor has rebutted the *prima facie* validity of BHM's claim for $68,215.26 by a preponderance of the evidence.

3. The evidence in this case establishes that on August 4, 1984, BHM agreed to sell and deliver to the debtor by August 27, 1984, the metal frames and tubes in ques-

tion for a total sales price of $22,631. It has also been established that the debtor accepted from BHM non-conforming merchandise which was delivered late and with respect to which the debtor incurred expenses of $11,047.15 to convert the merchandise to conform to the quality which was called for under the terms of sale.

4. BHM's proof of claim for $68,215.26 shall be reduced to $7,583.85, based upon a purchase price of $22,631, less the debtor's deposit of $4000 and minus the debtor's reasonably incurred expenses of $11,047.15 to repair the merchandise in question.

SETTLE ORDER on notice.