In re Lawrence OUSLEY, Jr., Mary A. Ousley, Debtors.

Bankruptcy No. 2–87–04972.

United States Bankruptcy Court, S.D. Ohio, E.D.

Sept. 30, 1988.

Joseph A. Oths, Oths and Heiser, Wellston, Ohio, and Pamela N. Maggied, Columbus, Ohio, for debtors.

Charles P. Hurley, Patricia M. Scanlon, Vorys, Sater, Seymour and Pease, Columbus, Ohio, for claimant Barnett Sales, Inc.

Frank M. Pees, Worthington, Ohio, Chapter 13 Trustee.

## OPINION AND ORDER ON OBJECTION TO CLAIM

BARBARA J. SELLERS, Bankruptcy Judge.

This matter is before the Court upon an objection to the claim of Barnett Sales, Inc. ("Barnett"). The objection, filed on behalf of Lawrence and Mary A. Ousley, was opposed by Barnett and was heard by the Court.

The Court has jurisdiction in this matter under 28 U.S.C. § 1334(b) and the General Order of Reference in this district. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) in which this bankruptcy judge may enter a final order.

## FINDINGS OF FACT

Mary and Lawrence Ousley are debtors with a Chapter 13 case pending before this Court. The plan they have proposed for repayment of their creditors has not yet been confirmed because the issue of Barnett's claim must be resolved before it can be determined whether the plan meets the feasibility requirement of 11 U.S.C. § 1325(a)(6). Barnett has objected to confirmation of the debtors' plan.

Barnett is a truck sales and service business owned and managed by members of the Barnett family, including Hyman Barnett, his son Charles, and Hyman's grandsons and Charles' nephews, Kevin and Rodney Barnett. Robin Barnett is also involved in the business, but the Court is unsure of his relationship. A related company known as Barnett Ford Co. is operated at the same location. However, Barnett Ford is not involved in this matter.

Mary Ousley was employed as a bookkeeper by Barnett Sales, Inc. from 1977 until August of 1985. During her employment Mary Ousley apparently converted to her personal use certain cash assets belonging to Barnett. She subsequently revealed the facts of that embezzlement to Kevin Barnett in connection with his review of the company's books. At that time Mary Ousley offered to repay the funds.

At the request of Rodney Barnett, Mary Ousley and her husband, Lawrence, met with Rodney, Kevin, and Robin Barnett and Barnett's attorneys in a law office in Columbus, Ohio. During that meeting on September 13, 1985, at which the Ousleys were unrepresented by counsel, both Mary and Lawrence Ousley agreed to certain terms of repayment to Barnett.

To effectuate the repayment, Mary and Lawrence Ousley executed a cognovit note in favor of Barnett in the principal sum of $127,000 and an agreement setting forth their arrangement for repaying that note. The Ousleys also granted Barnett a second mortgage against their residence and may have granted liens against certain personalty. In addition, Mary Ousley signed a written statement admitting her embezzlement.

The Ousleys made a $1,000 initial payment under the terms of the agreement and paid $700 each month to Barnett from September, 1985 until June, 1986. At that time the payments ceased. Although Barnett eventually instituted an action to foreclose its interest in the Ousleys' real property, prior to the scheduled judicial sale of the residence, the Ousleys sought relief under the provisions of Chapter 13 of the Bankruptcy Code. Barnett filed its claim in the amount of $151,334 and that claim is now challenged by the Ousleys.

The Ousleys assert that Barnett's claim is unenforceable because the documents establishing the obligation were executed under duress. Specifically, the Ousleys allege that they were forced to sign the note, agreements, second mortgage deed and financing statements because Mary Ousley had previously been convicted of embezzlement from a former employer and the Ousleys feared that similar charges, if proven, would result in significant criminal sanctions against her.

In support of the assertion that the documents were not executed freely, Mary Ousley described certain aspects of Barnett's business which tended to cast doubts upon the reliability of its books and records and, by inference, upon the accuracy of the amount of her liability to Barnett. The fact that funds were misappropriated by Mary Ousley is uncontested.

In her job with Barnett, Mary Ousley performed certain miscellaneous clerical duties as well as bookkeeping activities. Her duties included helping with customers in the parts and service area, maintaining the cash and sales journals, sending monthly financial statements to Barnett's accountant, posting accounts receivable records and reconciling bank deposits against the records of sales which showed receipts of checks and cash. Mary Ousley removed checks and cash receipts from the parts area on a daily basis, recorded those receipts onto a daily balance sheet and was responsible for depositing those funds in Barnett's bank account. Testimony established that she regularly failed to deposit all cash receipts. The records showing actual receipts, both cash and checks, were not capable of reconciliation against the deposit records. A cash fund in the amount of $500, kept in a safe, was also available to Mary Ousley and the Barnetts. That account was replenished from time to time without reconciliation. Mary Ousley's activities apparently extended from 1977 to 1985, and during that period her work was unsupervised and Barnett's books were not audited. Mary Ousley did not know the total amount diverted by her actions.

Other unrecorded expenditures also were made from the cash receipts. Certain persons were paid for casual labor on a farm owned by various members of the Barnett family and certain employees of Barnett apparently were given supplemental pay over a period of time. Mary Ousley's testimony that such payments from the cash receipts were made only upon specific direction from members of the Barnett family was uncontested. These payments were revealed so that the Court might infer a serious discrepancy or overstatement in the amount of the debt asserted by Barnett. However, it is not clear whether such payments occurred after daily cash receipts were recorded such that monies diverted in this manner would have contributed to the discrepancy between receipts and deposits in the company's records. Barnett's witnesses sought to minimize the amount of such diversions, while Mary Ousley indicated that the payments to employees, including herself, extended about four years, in the approximate amount of $120 each week. Even if the daily receipts shown on the books included significant unrecorded payments to casual labor and to several employees of Barnett, unless the documentary evidence fixing the amount of her debt is invalidated, it is Barnett's position that such amounts may not appropriately be considered by the Court.

The Ousleys testified at length about events which occurred after Mary Ousley admitted to Kevin Barnett her diversion of funds. Although she continued to work at Barnett until after the documents in Barnett's favor were executed, steps were taken by Barnett to bar her access to cash or checks. She was not fired, but eventually she ceased coming to work.

About one week after her confession, Mary Ousley received a telephone call from Rodney Barnett. She stated that Rodney threatened to file a criminal complaint against her unless she came to Columbus and signed certain papers. Rodney Barnett denied that prosecution was ever threatened or considered and indicated that Mary Ousley had been a long-time friend of the Barnett family. Indeed, the Court observed that the Barnetts appeared genuinely surprised by Mary Ousley's defalcation and did not appear to hold vindictive attitudes toward her. Rodney Barnett stated, however, that Mary Ousley's presence in Columbus was required so that arrangements could be finalized to provide for repayment of the diverted funds. Lawrence Ousley's presence in Columbus may not have been requested. During the period between her confession and her appearance in Columbus, Mary Ousley did not seek legal counsel.

The circumstances surrounding the meeting in Columbus between Mary and Lawrence Ousley on the one hand, and three members of the Barnett family and two of Barnett's lawyers, on the other hand, are contested. Lawrence Ousley indicated that he voluntarily drove his wife to Columbus from their residence in Jackson, Ohio because she was very nervous and distraught over the embezzlement and the recent

death of a son. He further stated that she had tried to harm herself after the diversion came to light. After an hour and a half drive, the Ousleys appeared, unrepresented, at the offices of the Barnett's attorneys. The parties met without breaking for lunch until mid or late afternoon. That meeting was recorded on tape without the knowledge or consent of the Ousleys. Lawrence Ousley remained with his wife during the entire meeting except for a brief period after the documents had been signed when he went into the hall with one of Barnett's attorneys. His unrebutted testimony was that he was told at that time not to consult an attorney with regard to the executed documents.

Other than the contested allegation that Rodney Barnett threatened her with prosecution if she did not go to Columbus and Lawrence Ousley's initial testimony that he was directed to sign the documents if he wished to prevent prosecution of his wife, there is no evidence that criminal prosecution was threatened or discussed by the Barnetts or their attorneys. In fact, Lawrence Ousley later corrected his testimony to indicate that no explicit threats were made to him. Similarly, no evidence exists of overt mistreatment of the Ousleys by the Barnetts or their attorneys. Mary Ousley indicated that she raised questions during the meeting about the various discrepancies in Barnett's books. The documents were not presented for signature until near the end of the meeting. The Ousleys did not seek legal counsel until Barnett instituted the foreclosure action against their residence. Prior to the execution of the documents, Lawrence Ousley had no obligation, either legal or moral, to Barnett.

## ISSUES

The issues before the Court are as follows:

(1) How is the burden of proof, including both the burden of going forward and the burden of persuasion, to be allocated for each stage of this contested matter?

(2) Are the note and the associated agreement voidable at the discretion of the

Ousleys because the contractual obligation resulted from duress?

(3) Is the obligation to Barnett from Lawrence Ousley unenforceable for lack of consideration?

(4) If the resulting contract is voidable, did Barnett nevertheless establish its entitlement to assert a claim for $151,334?

By agreement of the parties, the final issue was not tried, but was reserved for later hearing if the duress issue is decided in favor of the Ousleys and the contract resulting from execution of the documents is thereby rendered voidable.

## CONCLUSIONS OF LAW

### 1. *The Burden of Proof Issue*

 Because 11 U.S.C. § 502(a) and Bankruptcy Rule 3001(f) grant a prima facie effect to the validity and amount of a claim which has been properly filed with the Bankruptcy Court, the Ousleys had the initial burden of establishing a colorable challenge to Barnett's claim. Once the issue of duress had been raised by the Ousleys, however, under normal rules in the claims objection process, the burden of going forward and the ultimate burden of proof switched to Barnett as the claimant against the estate. *In re Wells*, 51 B.R. 563, 566 (D.Colo.1985); *In re Lamica Corp.*, 65 B.R. 849, 854 (Bankr.S.D.N.Y. 1986); *see also* 3 *Collier on Bankruptcy* ¶ 502.01[3] (15th ed. 1987). That burden was met by the introduction into evidence of verified documentary evidence showing the cognovit note, the agreement by both Ousleys, the statement of Mary Ousley admitting the conversion, the second mortgage deed and the various filed financing statements relating to security interests in fixtures and personalty. The security agreements giving rise to the liens against personalty were not appropriately authenticated and were not offered into evidence.

 After Barnett thus established its claim in the original amount of $127,000, payable at 12% interest, the burden of going forward shifted to the Ousleys. This somewhat unusual shift occurred because the Ousleys' defense of duress is an affirm-

ative one which must be established by the party asserting it. *Wells*, 51 B.R. at 567. Further, under Ohio law, the standard of proof for the defense of duress is "clear and convincing." *Willis v. Baker*, 75 Ohio St. 291, 79 N.E. 466 (1906). Accordingly, once Barnett established its claim by use of documentary evidence, the burden shifted to the Ousleys to show by clear and convincing evidence that the resulting contractual obligation was invalid because it had been procured under duress. If that defense is established, the burden of production and the ultimate burden of persuasion as to the appropriateness of the claim without benefit of the documents will shift again to Barnett under the procedure agreed to by the parties.

The parties further agreed and the Court concurred that if the Ousleys meet their burden of proof for the affirmative defense, a later hearing will be set at which time Barnett may attempt to establish the amount and appropriateness of its claim, independent of the documents. It is clear to the Court, even without the documents, that an obligation exists to Barnett from Mary Ousley. Without the documents, however, the amount of that obligation may be unliquidated and any liability on the part of Lawrence Ousley is disputed.

## 2. *The Duress Issue*

 Establishment of duress or coercion as an affirmative defense, which makes the effect of an instrument voidable, requires proof that the instrument was executed under such physical compulsion or threat that as to the party so coerced, no assent can be implied. E. Allan Farnsworth, *Contracts* § 4.16 (1982). Duress has been likened to a fraud which is based not upon the misuse of confidence, but upon fear which is inappropriately generated in or felt by the other party and which drives him toward the performance of an irrational action. *Tallmadge v. Robinson*, 158 Ohio St. 333, 109 N.E.2d 496 (1952); *Gallaher Drug Co. v. Robinson*, 13 Ohio Misc. 216, 232 N.E.2d 668 (Vandalia Mun. Ct.1965). It can also be established by a showing that a lawful process has been abused. See *Reinhard v. City of Colum-*

*bus*, 49 Ohio St. 257, 31 N.E. 35 (1892). It is not sufficient to establish duress, however, that hard bargaining positions exist or financial circumstances exert pressure on a party. *Continental Ill. Nat'l. Bank & Trust Co. v. Stanley*, 606 F.Supp. 558, 562 (N.D.Ill.1985). The remedy of reformation of a document for reasons of duress is available only if duress is shown by clear and convincing evidence. *Willis v. Baker*, 75 Ohio St. 291, 79 N.E. 466 (1906). The determination of what constitutes duress generally is a matter of law, but whether duress exists in a particular transaction is a question of fact. *Bartlett v. Richardson Co.*, 27 Ohio App. 263, 271, 161 N.E. 403, 405 (Ct.App.1927).

 In analyzing the legal definition of duress as applied to the facts established in this case, the Court is disturbed by the vision of two unrepresented individuals from a small community, under emotional stress because of anticipated potential criminal sanctions against one of them, coming into a large law firm for a lengthy meeting, recorded without their knowledge, at which the other side had three parties and two attorneys present. While recognizing that an employer may need to be able to handle wrongful behavior of an employee by an agreed-upon settlement which provides restitution for the employer, the wisdom of the setting within which the agreements at issue were executed is questioned. It appears that an effort to suggest and permit representation of the employee and her spouse would have been appropriate for a number of reasons. The Court also has questions about the degree to which participation in such a process, on both sides, affects the rights of the state to prosecute criminal behavior. The Court notes, however, that no evidence of any agreement to forebear from prosecution was introduced into evidence.

Despite such reservations about the process, however, to the extent of the monies embezzled from Barnett, the Court does not find that the evidence in this matter clearly and convincingly established duress as that term has been defined in Ohio. No proof exists that action known to be un-

available or wrongful was threatened. In fact the initial offer to repay the monies came from Mary Ousley. Given the facts of Mary Ousley's diversion of Barnett's cash, her prior conviction for a similar offense and her existing disposition toward infliction of self-harm, the Court cannot find that execution of the documents in favor of Barnett was an irrational or ill-advised act on her part. Certainly the bargaining power was grossly unequal, but that alone does not establish duress. *Continental Ill.*, 606 F.Supp. at 562.

Further, the Court is reasonably convinced that, with or without the meeting at the law firm, Mary Ousley and Lawrence Ousley, if requested, would have agreed to formalize the repayment obligation and grant Barnett an interest in collateral to secure that debt.

Lawrence Ousley's willingness to execute the documents and his feelings of stress came primarily from his need to protect his wife and make it possible for her to avoid criminal prosecution and further emotional turmoil. The evidence received failed to show that he was forced into signing the documents by overt threats or false or wrongful representations. Apparently he was urged to agree to the terms of the note and mortgage, however, and the relief for his wife may have depended upon his cooperation since she had no funds with which to repay the obligation. The formal journalization of an obligation from both Ousleys and the pledging of jointly-owned collateral does not seem unduly harsh under the circumstances.

The finding that duress has not been proven, however, extends only to the actual demonstrable amount embezzled by Mary Ousley. As to any amount for which the Ousleys obligated themselves which is shown to be in excess of the amount actually taken, the obligation created to Barnett will be invalidated by the Court and the contract reformed as one made voidable by duress. It is the amount of obligation undertaken by the Ousleys which, when combined with the circumstances surrounding the transactions, gives the Court concern.

These parties had vast disparity in bargaining power at the time of the meeting in the law firm's offices. Although Mary Ousley testified that she voiced her concerns about other payments which may also have affected the imbalance in Barnett's accounts, the Court is not satisfied that such concerns were seriously considered. Nor does the Court consider Mary Ousley, who appeared to be of a retiring and somewhat timid nature, to be a fair match for assertive attorneys and their wronged clients. Lawrence Ousley, of course, may have had no meaningful knowledge of the accuracy of the amount his wife was accused of taking.

In retrospect, as a court of equity, this Court finds that duress has not been shown which is sufficient to void the collateralized obligations of Lawrence and Mary Ousley to repay Barnett to the extent of provable sums embezzled by Mary Ousley. However, to the extent the contractual relationship created by the documents obligates the Ousleys to repay sums in excess of those taken, duress is found and the note, mortgage and security agreements are invalid.

### 3. The Consideration Issue

■ The final defense sought to be established to invalidate the contract created by the documents executed by the Ousleys is an assertion that Lawrence Ousley's obligations to Barnett were incurred without consideration and are, therefore, unenforceable. The Court finds this defense to be without merit.

It is true that Lawrence Ousley received no direct consideration for obligating himself to Barnett by the cognovit note, mortgage deed or various security agreements. It is not accurate, however, that no consideration existed for those agreements. The consideration went to Mary Ousley in the nature of forebearance from criminal prosecution and for repayment of an involuntary loan. That it did not flow directly to Lawrence Ousley, but went to his wife, does not make the associated promises unenforceable. *Davis v. Yellow Manufacturing Acceptance Corp.*, 242 F.2d 503, 505

(6th Cir.1957). Nor is it a defense that the obligation of the third party is an antecedent one. *Sur–Gro Plant Food Co., Inc. v. Morgan,* 29 Ohio App.3d 124, 129–30, 504 N.E.2d 445, 451 (Ct.App.1985). The same result applies where a security agreement is given in exchange for a benefit to a third party. *See Libco Corp. v. Leigh (In re Reliable Manufacturing Corp.),* 703 F.2d 996 (7th Cir.1983).

Accordingly, to the extent the note, agreement, mortgage deed and security agreements are valid under the duress holding, such obligations are not invalid as to Lawrence Ousley for lack of consideration.

The Court is aware that additional evidence will be required to establish the extent of the validity of the note and agreement to repay, as collateralized by the mortgage deed and security agreements. Allocation of the burden of proof on the issue of establishing the correct amount may also be argued. Such further hearing will be held on **Monday, November 14, 1988 at 2:00 p.m.** in Courtroom **130,** 85 Marconi Boulevard, Columbus, Ohio 43215. Further evidence may also be presented at that time to support the grants of security interests in personalty.

IT IS SO ORDERED.