**In the Matter of Raymond R. VAN KYLEN, Debtor.**

**MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Plaintiff,**

v.

**Raymond R. VAN KYLEN, William J. Rameker, Trustee, Lillian Van Kylen, Citizens State Bank, Defendants.**

**Adv. No. 87–0070–7.**

United States Bankruptcy Court, W.D. Wisconsin.

April 4, 1989.

---

Roy L. Prange, Jr., Ross & Stevens, S.C., Madison, Wis., for Citizens State Bank.

Michael S. Varda, Huggett, Schumacher, Morgan, S.C., Madison, Wis., for Merrill Lynch, Pierce, Fenner & Smith, Inc.

William S. Holland, McBurney, Perina, Wyngaard, Wilson & Raymond, Madison, Wis., for Raymond and Lillian Van Kylen.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

This is an interpleader action to determine the rights of the Citizens State Bank

(the "Bank"), the bankruptcy trustee, and the debtor's spouse in $50,000.00 currently held by Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch, Inc."). The Bank claims ownership of the entire $50,-000.00 by virtue of the prepetition enforcement of a security interest. The trustee asserts that the Bank's security interest was not perfected, and seeks to bring the entire $50,000.00 into the bankruptcy estate by avoiding the enforcement of the security interest. The debtor's spouse, who has not filed bankruptcy, claims a one-half interest in the funds as a joint tenant, and alleges that the encumbrance of her interest was invalid for want of consideration. Merrill Lynch, Inc. has been dismissed pursuant to a stipulation of the parties. After a hearing on cross motions for summary judgment filed by the Bank, the trustee, and the debtor's spouse, the matter was taken under advisement. The parties then completed briefing the issues.

The facts are fairly complex. On April 24, 1981, the Bank advanced $213,000.00 to Mitchell Color Graphics, Inc., n/k/a RVK, Inc. (the "Corporation"), pursuant to a promissory note executed by the Corporation. Mr. Van Kylen, an officer, employee, and stockholder of the Corporation, personally guarantied payment of the note. The guaranty was also signed by Mrs. Van Kylen and was secured by a mortgage on the Van Kylen's homestead, which was owned in joint tenancy.

On May 17, 1982, the Bank advanced $120,000.00 to the Corporation pursuant to a second corporate note. Mr. Van Kylen again guarantied payment of the note, and secured the guaranty by a second mortgage on the homestead which was executed by both Van Kylens.

In August of 1984, Mr. Van Kylen advised the Bank of his desire to sell the homestead. The Bank agreed to release its mortgages in exchange for a security interest in $50,000.00 of the sale proceeds, and a promise that the proceeds subject to the Bank's security interest would be deposited in an account with Merrill Lynch, Inc. in which a balance of at least a $50,000.00 would be maintained at all times.

On August 31, 1984, the Bank executed a release and satisfaction of their two mortgages in return for the Van Kylens granting it a security interest in $50,000.00 of the proceeds from the sale of their home. On or about that same date, the Van Kylens sold their home. Fifty thousand dollars from the sale proceeds were deposited with the Bank in the form of a certificate of deposit, payable to either of the Van Kylens.

On September 27, 1984, the Van Kylens opened a "Cash Management Account" (the "CMA") with Merrill Lynch, Inc. as joint tenants with right of survivorship. Under the terms of the CMA agreement the Van Kylens had the power to direct Merrill Lynch, Inc. to allocate any monies deposited into their CMA among three types of accounts: a conventional securities account; a money account, consisting of either a money market deposit account or money market fund shares; and a card/check account. By the last of these alternatives the Van Kylens could have had direct access to the monies on deposit at any time.

Initially, the Van Kylens directed Merrill Lynch, Inc. to invest the funds in their CMA in $25,000.00 of government securities and $25,000.00 of certificates of deposit. Apparently, certificates evidencing these investments were not issued to the Van Kylens. The Van Kylens never requested the issuance of either a bank credit card or checking privileges for use in relation to their CMA.

Also on September 27, 1984, the Van Kylens and the Bank entered into a written agreement (the "Assignment Agreement") by which the Van Kylens granted the Bank a security interest in their CMA to the extent of $50,000.00 and agreed to maintain a minimum balance of at least that amount.[1] The Assignment Agreement permitted the Van Kylens to direct the use of

---

1. Contemporaneously, the Van Kylens executed a "Collateral Pledge Agreement," by which they "grant[ed] to [the] Bank a security interest in all property of the Debtor of any kind now in the possession or control of [the] Bank for collateral purposes."

the $50,000.00 in the CMA on the condition that "[a]ll amounts in the [CMA] up to $50,000 shall be in instruments, documents, securities or other similar items which are either insured by FDIC/FSLIC or are issued by the United States Government." The Agreement also provided that the Bank could enforce its security interest in the CMA by written notice to Merrill Lynch, Inc. that was either signed by the Bank and the Van Kylens, or signed by the Bank alone, certifying that an " 'event of default' exists as of the date thereof" under the notes or Mr. Van Kylen's personal guaranties.

On October 1, 1984, the Bank cashed the Van Kylens' $50,000.00 certificate of deposit and forwarded a check for $50,000.00 to Merrill Lynch, Inc. to be deposited in the CMA. No financing statement relating to the Bank's security interest in the CMA was ever filed with the Secretary of State.

On February 3, 1987, the Bank sent written notice to the Van Kylens that the Corporation was in default, and demanded payment under Mr. Van Kylen's personal guaranties. On February 12, 1987, the Bank made a written demand upon Merrill Lynch, Inc. that title to the CMA be transferred from the Van Kylens to the Bank, but failed to certify that an event of default had occurred as required by the Assignment Agreement. On February 19, 1987, the Bank provided Merrill Lynch, Inc. with a corrected written notice of the default.

On March 3, 1987, Mr. Van Kylen filed a chapter 7 bankruptcy petition. Merrill Lynch, Inc. has since liquidated the funds in the CMA and currently holds them in escrow pending the outcome of this litigation. At all times relevant, the outstanding balance of the debts secured by Mr. Van Kylens' personal guaranties exceeded $50,000.00.

The trustee has moved for summary judgment on the grounds that the Bank never perfected its security interest under Wisconsin's version of the Uniform Commercial Code (the "U.C.C."), and that the prepetition enforcement of the unperfected security interest constituted a preferential transfer transfer of funds in the CMA to the Bank. The Bank disputes the applicability of the U.C.C. to the transaction and argues that its lien was perfected under the common law of pledges or assignments. Other than arguing that its lien was perfected, the Bank has raised no argument against a finding that the transfer of Mr. Van Kylen's interest was a preference avoidable under Bankruptcy Code section 547. The Bank, however, contests any nullification of the enforcement of its lien on Mrs. Van Kylens' interest.

■ The threshold issue in this case is the applicability of Wisconsin's version of Article Nine of the U.C.C. *See* WIS.STAT. §§ 409.101—.905 (1987–88). If Article Nine does not apply, the transaction is subject to the common law governing pledges or assignments. *See* WIS.STAT. § 409.103 (1987–88); *Broadnax v. Prudential–Bache Securities (In re Zimmerman)*, 69 B.R. 436, 438 n. 1 (Bankr.E.D.Wis.1987).

The Bank claims its security interest in the CMA by virtue of an instrument denominated an "Assignment." Paragraph 1 of the Assignment Agreement provides:

> In consideration for the [Bank] releasing [the Van Kylens'] residence from collateral for the above-mentioned loans, and other good and valuable consideration, [the Van Kylens] do[ ] hereby assign to Assignee, solely as collateral for the above-mentioned notes, all of their rights, title and interest in the cash account up to $50,000.

Presumably, Article Nine applies to the creation of this security interest. As section 409.102(1)(a) provides:

> (1) Except as otherwise provided in s. 409.104 on excluded transactions, this chapter applies:
>
> (a) To any transaction (regardless of its form) which is intended to create a security interest in personal property or fixtures including goods, documents, instruments, general intangibles, chattel paper or accounts.

WIS.STAT. § 409.102(1)(a) (1987–88). There is no dispute that the CMA is an item of personal property, or that the transac-

tion involving the Van Kylens' respective interests in the CMA was intended to create a security interest in the CMA.

As section 409.102(2) makes clear, the use of the non-U.C.C. nomenclature in the Assignment Agreement does not take the transaction outside Article Nine:

> This chapter applies to security interests created by contract including pledge, assignment, chattel mortgage, chattel trust, trust deed, factor's lien, equipment trust, conditional sale, trust receipt, other lien or title retention contract and lease or consignment intended as security. . . .

WIS.STAT. § 409.102(2) (1987–88). Thus, Article Nine applies to this transaction unless it is specifically excluded by the U.C.C. itself.

The parties point to section 409.104(13) as the only basis upon which the transaction may be excluded from Article Nine's coverage. That section provides:

> This chapter does not apply:
>
> . . . .
>
> (13) To a transfer of an interest in any deposit account as defined in s. 409.-105(1), except as provided with respect to proceeds under s. 409.306 and priorities in proceeds under s. 409.312.

WIS.STAT. § 409.104(13) (1987–88). Because the CMA constituted original collateral, rather than proceeds from other items of collateral, neither of the two exceptions to the so-called deposit account exception is applicable. The point of contention is whether the CMA is a "deposit account" within the meaning of section 409.105(1)(e), which states:

> (1) In this chapter unless the context otherwise requires:
>
> . . . .

> (e) 'Deposit account' means a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit.

WIS.STAT. § 409.105(1)(e) (1987–88).

Cash Management Accounts have been offered by Merrill Lynch, Inc. since 1977 [2] as:

> an integrated program which links together three components: (1) a conventional securities account, (2) a choice of Money Accounts, including several no-load money market funds, and (3) an account which provides card and checking services maintained by the Bank.

Cash Management Account Agreement ¶ 1. The unique feature of the CMA is the ability of account holders to utilize both conventional banking services and brokerage services. Account holders can designate how they wish deposited funds invested, having as their choices any mix of the following: (i) conventional securities; (ii) a FSLIC or FDIC insured savings account paying interest at money market rates; (iii) shares in any of three money market funds—a "CMA Money Fund," a tax-exempt fund, or a government securities fund; and (iv) a checking account established with a participating banking institution, which provides access to the funds in the CMA by the use of checks drawn on, or a credit card issued by, that banking institution.

The definition of deposit account found in section 409.105(1)(e) directs attention to three factors: the type of account; the existence of an instrument evidencing the account; and the type of institution with which the account is maintained. The Offi-

---

**2.** Cash Management Accounts have been noted as an instance of "competition from non-bank financial institutions" with conventional banking entities.

> Other non-bank financial institutions also compete with commercial banks and savings institutions to some extent. In the recent period of high interest rates, competition from money-market funds for the savings of depositors who otherwise would use the services of commercial banks and savings institutions has been intense. Moreover, there appears to be a growing tendency for these non-bank institutions to offer services similar to those offered by banks and savings institutions. Major brokerage houses offer their customers diverse financial services. For example, Merrill Lynch, Pierce, Fenner and Smith has a Cash Management Account in which the customer receives interest on balances maintained, checking facilities, a charge card, and lending privileges.

F. Beutel & M. Schroeder, *Bank Officers' Handbook of Commercial Law* 5–45 (5th ed. 1982).

cial Comment to section 9–104 of the Official Text of the U.C.C. indicates that two concerns gave rise to the exception for deposit accounts: that security transactions involving deposit accounts were often unique, and thus not susceptible to treatment under a general commercial statute, and that existing law adequately dealt with transactions of this type. U.C.C. § 9–104 comment 7 (1977).

The statute speaks of "a demand, time, savings, passbook or like account ... other than an account evidenced by a certificate of deposit." WIS.STAT. § 409.105(1)(e) (1987–88). Distinguishing a "like account" from an "un-like account" should be done along functional lines. *See* U.C.C. § 9–101 comment (1977) ("The scheme of the Article is to make distinctions, where distinctions are necessary, along functional rather than formal lines."). The first distinction to be made is between those accounts that are the functional equivalent of money and those that are not.

The examples of accounts set forth in section 409.105(1)(e) share the common trait of being viewed as cash equivalents. Black's Law Dictionary defines "cash" as "[m]oney or the equivalent.... negotiable checks, and balances in bank accounts...." *Id.* at 196 (5th ed. 1979). Likewise, in the Article Nine provision dealing with deposit accounts as proceeds of other collateral, "money, checks, deposit accounts, and the like" are characterized as "cash proceeds." WIS.STAT. § 409.306 (1987–88).

On this point, the Bank's argument that the funds in the CMA were only accessible via checks drawn on an account maintained with a participating bank is relevant. However, the Van Kylens did not utilize the CMA as a checking account. If they had established a Card/Check Account in order to use either the checking or credit card options, the Van Kylens could have had access to their invested money (in excess of $50,000.00) simply by making check or credit card withdrawals. To the extent the funds in the Card/Check Account were insufficient to cover the withdrawals, Merrill Lynch, Inc. would have liquidated the Van Kylens' investments. Were a card or checking account access used, the CMA might more closely approach being a "like" account. Since this was not the case, the Van Kylens' CMA lacks the features of accessibility and liquidity characterizing "deposit accounts." *See State First National Bank v. Nix (In re Nix)*, 864 F.2d 1209, 1212 (5th Cir.1989) (court states that a Keogh Plan subject to penalty tax which discourages early withdrawals is different from a "savings account" under U.C.C. § 9–105(1)(e) which "refers to accounts from which the depositor may withdraw funds at any time, subject only to such notice agreements as the bank may require.").

There is a second distinction between "like" and "unlike" accounts. In bank accounts, the depositor possesses nothing more than a chose in action, *i.e.*, the deposit holder's obligation to repay the money deposited. *See Zimmerman*, 69 B.R. at 438 (" [M]oney deposited in a general account at a bank does not remain the property of the depositor.... the money deposited becomes the property of the depositary bank; the property of the depositor is the indebtedness of the bank to it, a mere chose in action.' ") (quoting *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 560 (2d Cir.1976). In a certificate of deposit the indebtedness of the bank is reified in the form of an instrument. By excluding accounts evidenced by certificates of deposit from the definition of "deposit account," the drafters of Article Nine appear to have drawn a distinction between those accounts which remain a mere chose in action and those which have been reified. *See* WIS. STAT. § 403.104(2)(a) (1987–88) ("A writing ... is ... [a] 'certificate of deposit' if it is an acknowledgment by a bank of receipt of money with an engagement to repay it."); *Southview Corp. v. Kleberg First Nat'l Bank*, 512 S.W.2d 817, 819–20 (Tex.Civ. App.1974) ("The promissory note theory of certificate of deposit has been incorporated into the Code...."). In the latter case, the rationale underlying the deposit account exception—the uniqueness of the account and the inadequacy of Article Nine vis-a-vis common law rules—is no longer applicable. *See* B. Clark, *The Law of Secured Trans-*

*actions Under The Uniform Commercial Code,* ¶ 1.8[12] at 1–76 (1st ed. 1980) (the "rationale [for the deposit account exception] does not apply to the pledge of a certificate of deposit, which is more akin to a promissory note."). Under the U.C.C., the certificate of deposit is treated as an "instrument," *see* WIS.STAT. § 403.104(3) (1987–88); *id.* § 409.105(1)(i), and a perfected security interest in it can be acquired under Article Nine, *see id.* § 409.304(1). Thus, the functional importance of this second distinction lies in the fact that as to the accounts evidenced by an instrument, the reified intangible evidencing the account is an item of collateral commonly used in commercial transactions and to which the U.C.C.'s rules are easily and specifically applied.

The form of the funds in the CMA is relevant. The Van Kylens' deposit was placed into government securities and, for some period of time, certificates of deposit. However, there is no evidence that securities certificates or certificates of deposit were issued to the Van Kylens. Therefore, it cannot be fairly said that the CMA was ever "evidenced" by a reified intangible. Nevertheless, the fact that the funds in the CMA were held as types of assets in which security interests are commonly taken cuts against a finding that this was a "like account." *See Nix,* 864 F.2d at 1212 (where funds deposited in Keogh plan were invested in shares of stock, court states that "[w]hereas bank accounts are funded solely with cash, a Keogh plan may be, as [the debtor's] was, funded in whole or in part with stock.").

Finally, it is important that section 409.-105(1)(e) speaks of an account "maintained with a bank, savings and loan association, credit union or like organization." The Van Kylens opened their CMA with Merrill Lynch, Inc., which held and invested the Van Kylens' deposit. Merrill Lynch, Inc. issued statements to the Van Kylens. While the Van Kylens could have used a Check/Card Account with a participating

bank, they did not do so.[3] Rather than the bank member of the Merrill Lynch family, the Van Kylens maintained their account with the investment brokerage member.

The enumerated types of "like organization[s]" indicate that the deposit account exception is limited to accounts maintained with traditional depository institutions. Merrill Lynch, Inc.—an investment firm—hardly qualifies as such an institution. *Cf. Gary Plastic Packaging Corp. v. Merrill Lynch,* 756 F.2d 230, 237 (2d Cir. 1985) (discussing distinction under federal law between investment banking and deposit banking). As the Fifth Circuit has stated in regard to a Keogh plan maintained with Merrill Lynch:

> Moreover, Merrill Lynch is not 'a bank' or 'like organization,' but a stock broker. It therefore could not accept deposits under Texas law. It held [the debtor's] Keogh plan assets as a fiduciary for him, not simply as a bank receiving a deposit. A Keogh plan therefore is not a 'deposit account' within the meaning of § 9.105(a)(5) ...

*Nix,* 864 F.2d at 1212 (footnotes omitted). For this reason, if for no other, the CMA does not come within the deposit account exception.

The deposit account exception is based on the notion that security interests in savings accounts, etc. are not the stuff of commercial secured financing. *See* G. Gilmore, *Security Interests in Personal Property* § 10.7 at 316 (1965) (exclusion for deposit accounts "reflect[s] the thought that such transfers are beyond the pale with respect to a statute devoted to commercial financing"). Whether the reality of today's commercial practice comports with the drafters' perceptions of commercial financing at the time the exception was drafted is an open question. It is unlikely that the drafters of Article Nine envisioned the existence of hybrid accounts of this type, much less their serving as collateral for commercial loans. However, I do not

---

**3.** Apparently the Van Kylens were required to enter into a separate agreement with Merrill Lynch, Bank and Trust Co. and Bank One, Columbus, N.A. for purposes of the Check/Card Account, even though the Van Kylens did not request that either checks or a credit card be issued to them.

believe that the stated rationale for the deposit account exception permits an expansive reading of the exception. Rather, the drafters' introductory comment that "[t]he aim of this Article is to provide a simple and unified structure within which the immense variety of present-day secured financing transactions can go forward with less cost and with greater certainty," U.C.C. § 9–101 comment (1977), discourages expanding the exception beyond conventional bank accounts maintained with traditional depository institutions. As the CMA brochure itself emphasizes to accountholders, "your CMA account should not be considered a bank account." CMA Brochure at 7.

It is clear from the foregoing that the Article Nine governs the parties' rights in the CMA. Thus, the inquiry shifts to whether the Bank has complied with Article Nine's requirements for the attachment and perfection of its claimed security interest.

A security interest is perfected "when it has attached and when all of the applicable steps required for perfection have been taken." WIS.STAT. § 409.303(1) (1987–88). A security interest "attaches" when the following events have occurred:

(a) The collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral ...;

(b) Value has been given; and

(c) The debtor has rights in the collateral.

WIS.STAT. § 409.203(1)(a)-(c) (1987–88). Upon attachment, the security interest is valid and enforceable between the debtor and the secured party. WIS.STAT. § 409.203(1) (1987–88).

■ The only condition for attachment which is seriously at issue [4] is whether the Bank "gave value." Section 401.201(44)(d) tells us that:

[A] person gives value for rights if he acquires them:

. . . .

(d) Generally, in return for any consideration sufficient to support a simple contract.

WIS.STAT. § 401.201(44)(d) (1987–88). Mrs. Van Kylen has moved for summary judgment on the grounds that the Bank's security interest did not attach to her interest in the CMA because she did not receive consideration. Because the U.C.C. nowhere defines "consideration," we are left to the common law of contracts to determine whether the Bank's security interest is enforceable against Mrs. Van Kylen's interest in the CMA.[5]

Under Wisconsin law, consideration "may consist of a detriment to the promisee or a benefit to the promisor." *First Wisconsin National Bank v. Oby*, 52 Wis. 2d 1, 6, 188 N.W.2d 454 (1971). With respect to the "benefit to the promisor" prong of this definition, the Wisconsin Supreme Court has quoted the following:

[A]ny benefit, profit or advantage flowing to the promisor which he would not have received but for the contract constitutes a sufficient consideration therefor. It is not necessary, however, that a benefit should accrue to the person making the promise; it is sufficient that some-

---

**4.** Mrs. Van Kylen also argues, although it must be assumed she is not serious about it, that the Collateral Pledge Agreement was insufficient to create a security interest in the CMA, since its scope is limited to collateral in the possession or control of the Bank. Assuming the collateral was not in the possession of the Bank, Mrs. Van Kylen overlooks the fact that the Assignment Agreement satisfies the requirement of section 409.203(1)(a) that "the debtor has signed a security agreement containing a description of the collateral." The Assignment Agreement was signed by both the Van Kylens. In paragraphs 1 and 2 of the Assignment Agreement, a description of the Bank's collateral is found:

1. ... [the Van Kylens] do[ ] hereby assign to [the Bank], solely as collateral ..., all of their rights, title and interest in the cash account up to $50,000.

2. All amounts in the Cash Account up to $50,000 shall be in instruments, documents, securities or other similar items which are either insured by FDIC/FSLIC or are issued by the United States Government.

**5.** WIS.STAT. § 401.103 (1987–88) ("Unless displaced by the particular provisions of chs. 401 to 409 the principles of law and equity ... shall supplement its provisions.").

thing valuable flows from the person to whom it is made, ... and that the promise is the inducement to the transaction. *Id.* at 6 n. 1, 188 N.W.2d 454 (*quoting* 17 C.J.S. *Contracts* § 74 at 757–61). As to the "detriment to the promisee" prong, the Court quoted the following from Professor Williston's treatise:

'It would be a detriment to the promisee, in a legal sense, if he, at the request of the promisor and upon the strength of that promise, had performed any act which occasioned him the slightest trouble or inconvenience, and which he was not obligated to perform.'

*Oby,* 52 Wis.2d at 5–6, 188 N.W.2d 454 (*quoting* W. Jaeger, *1 Williston on Contracts* § 102A at 380 (3d ed. 1957)). The treatise elsewhere states that the proposition that "a detriment suffered by the promisee at the promisor's request and as the price for the promise is sufficient, though the promisor is not benefited, is well settled." W. Jaeger, *1 Williston on Contracts* § 102 at 377 (3d ed. 1957).

Mrs. Van Kylen argues that she received no benefit from the loan to the Corporation and thus her granting two mortgages on her home was not supported by consideration. She then argues that since the underlying mortgages were not enforceable their release by the Bank did not constitute consideration for the replacement security interest in the CMA.

Mrs. Van Kylen's granting of the underlying mortgages was indeed supported by sufficient consideration. The first mortgage instrument states that the mortgage was "given to secure the payment of SBA Guaranty dated April 24, 1981 in the principal sum of $213,200.00, signed by Raymond R. Van Kylen." The second mortgage instrument states that the mortgage was "given to secure payment of a promissory note dated May 17, 1982 in the principal sum of $120,000.00 signed by MITCHELL COLOR GRAPHICS, INC."

There is no doubt that the Bank gave something of value in return for the mortgages, *i.e.,* the loan proceeds. That this benefit flowed to the Corporation and to Mr. Van Kylen does not defeat the mortgage contract if that benefit was the inducement to Mrs. Van Kylen's promise. *See Oby,* 52 Wis.2d at 5–6, 188 N.W.2d 454; *see also In re Ousley,* 92 B.R. 278, 284 (Bankr.S.D.Ohio 1988) (husband's obligations under security agreements are enforceable where consideration flowed directly to wife rather than to him).

The Restatement (Second) of Contracts sets forth a number of illustrations demonstrating that consideration supported the granting of the mortgages by Mrs. Van Kylen even if the benefit given by the Bank ran solely to Mr. Van Kylen and the Corporation. Comment e to section 71 reads as follows:

*e. Consideration moving from or to a third person.* It matters not from whom the consideration moves or to whom it goes. If it is bargained for and given in exchange for the promise, the promise is not gratuitous.

**Illustrations:**

14. A promises B to guarantee payment of a bill of goods if B sells the goods to C. Selling the goods to C is consideration for A's promise.

15. A makes a promissory note payable to B in return for a payment by B to C. The payment is consideration for the note.

Restatement (Second) of Contracts § 71, comment e at 176 (1981).

Additionally, there is some evidence to indicate that Mrs. Van Kylen herself received a benefit from the transaction. Her husband was a minority shareholder in the Corporation, as well as one of its employees. The following is excerpted from Mr. Van Kylen's deposition:

Q: By the way, in the time from the first note to the second were you receiving a salary from Mitchell Colorgraphics, Inc.?

A: Yes.

Q: And that was used for family purposes, both you and your wife were supported by it?

A: Yes.

Adversary Deposition of Raymond Richard Van Kylen at 10–11. As this excerpt dem-

onstrates, because the loans to the Corporation in some measure permitted it to continue operations and thus to provide income to Mr. Van Kylen, Mrs. Van Kylen benefitted from the transaction. Moreover, for some period of time, Mrs. Van Kylen was herself employed by the Corporation. Affadavit of Lillian S. Van Kylen ¶ 2.

Since the mortgages appear to have been enforceable, their release by the Bank conferred a benefit on Mrs. Van Kylen and a detriment on the Bank. The Bank gave up the right to look to the homestead for the satisfaction of any default on the part of the Corporation or Mr. Van Kylen. There is no merit to Mrs. Van Kylen's claim that she did not receive consideration for the mortgages and the security interest granted to the Bank. Therefore, the Bank's security interest attached to the CMA and its contents.

The inquiry now turns to whether the Bank's security interest was perfected. If unperfected, the security interest is junior in priority to a "person who becomes a lien creditor before the security interest is perfected." WIS.STAT. § 409.301(1)(b) (1987–88). The bankruptcy trustee holds the rights of a hypothetical lien creditor, and can void the junior lien. 11 U.S.C. § 544(a)(1). Thus, if the Bank's security interest was unperfected, it would lose its lien and become an unsecured creditor in Mr. Van Kylen's bankruptcy. *See* B. Clark, *The Law of Secured Transactions Under The Uniform Commercial Code* ¶ 2.5 at 2–16 (1st ed. 1980).

The "essence of the perfection process is furnishing public notice of the secured party's interest in the collateral, thereby protecting third persons against the secret or undisclosed lien." J. Worley, *Possessory Security Interests*, ¶ 14.01[2][b] at 14–7 *in* Coogan, Hogan, Vagts & McDonnell, *1B Secured Transactions Under the Uniform Commercial Code* (rev. ed. 1988). Excluding those instances where a security interest is deemed to be perfected upon attachment and without any further action by the secured party, *see, e.g.,* WIS.STAT. § 409.302(1)(d) (1987–88) (automatic perfection of security interest in consumer goods

having a purchase price not in excess of $500.00), the "steps required for perfection" under Article Nine are either the filing of a financing statement in the appropriate public office, *see* WIS.STAT. § 409.302(1) (1987–88), or the secured party taking possession of the collateral, *see id.* § 409.305. Additionally, since April 26, 1986, a revised Article Eight of the U.C.C. has provided the means for perfecting security interests in investment securities. *See id.* §§ 408.321, 408.313(1).

■ The parties address perfection of the Bank's security interest as if it covered only the contents of the CMA (the government securities and certificates of deposit), without any discussion of whether the Bank's security interest in the CMA itself is perfected. However, the Bank's failure to file a financing statement with respect to its security interest in the CMA itself is clearly fatal. The Van Kylens' rights in the CMA are a "general intangible" under section 409.106:

> 'General Intangibles' means any personal property property (including things in action) other than goods, accounts, chattel paper, documents, instruments and money.

WIS.STAT. § 409.106 (1987–88). *See Nix,* 864 F.2d at 1211 ("the right of the person who establishes a Keogh plan to withdraw funds from the trust or account established to implement the plan" is a "general intangible"); *Sherman v. Eugene Farmers Cooperative (In re Cosner),* 3 B.R. 445, 448 (Bankr.D.Ore.1980) (debtor's rights in capital reserve account maintained with agricultural cooperative are "general intangibles"). Therefore, the filing of a financing statement was required in order to perfect the Bank's security interest. *See* WIS. STAT. § 409.302(1) (1987–88); U.C.C. § 9–305, comment 1 (1977) ("A security interest in accounts and general intangibles—property not ordinarily represented by any writing whose delivery operates to transfer the claim—may under this whose delivery operates to transfer the claim—may under this Article be perfected only by filing . . . .").

Even if we were to focus on the contents of the CMA, which we need not, the Bank's security interest was unperfected. The parties seem to agree that the funds in the CMA were invested in government securities and, at one time, certificates of deposit, and that these investments were not reduced to certificate form.[6] Because it is undisputed that the Bank did not file a financing statement with respect to any type of collateral, unless the Bank can fit itself within one of various exceptions to the filing requirements of section 409.-302(1), its security interest in the Van Kylens' rights in the investments was unperfected.

■ The Bank claims that either of two exceptions applies: the exception for possessory security interests or the exception for security interests in securities. As to the first of these arguments, the Bank relies on section 409.302(1)(a), which provides:

(1) A financing statement must be filed to perfect all security interests except the following:

(a) A security interest in collateral in possession of the secured party under s. 409.305.

WIS.STAT. § 409.302(1)(a) (1987–88). Section 409.305 provides in relevant part:

A security interest in letters of credit and advices of credit (s. 405.116(2)(a)), goods, instruments (other than certificated securities), money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest.

WIS.STAT. § 409.305 (1987–88). Thus to merit the exception under section 409.305 the collateral must exist in a tangible form and the secured party must be in "possession" of that collateral.

The Bank's argument fails at the threshold. Because no certificates representing the Van Kylens' rights in the investments were issued, the Bank's collateral must be classified as a "general intangible." *See Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702 (9th Cir.1976); *Krohn v. Omni–Veterinary Supply Co., Inc. (In re Nash)*, 70 B.R. 40, 43 (Bankr.E. D.N.Y.1987). As such, the possessory security interest exception is inapplicable. *See* U.C.C. § 9–305 comment 1 (1977) ("This section permits a security interest to be perfected by transfer of possession only when the collateral is goods, instruments ...; that is to say, accounts and general intangibles are excluded.").

Even if we assume that certificates representing the investments were issued to the Van Kylens, there is nothing to suggest that the Bank was "in possession" of those instruments. Assuming the government securities were certificated and the certificates of deposit were issued, the collateral existed in the form of instruments. *See* WIS.STAT. § 409.105(1)(i) (1987–88) ("'Instrument' means a negotiable instrument as defined in s. 403.104 or a certificated security as defined in s. 408.102"); *id.* § 403.104(2)(a) (certificate of deposit qualifies as a negotiable instrument "if it is an

---

**6.** The parties' agreed proposed findings of fact do not address this point. In their briefing, however, the parties concur that the funds in the CMA were invested in certificates of deposit and government securities and that neither stock certificates nor certificates of deposit were actually issued. Trustee's Brief at 6, 11; Bank's Brief at 28; Bank's Reply Brief at 11.

Actual evidence of the contents of the CMA is found in the document evidencing the opening of the CMA. This document contains a box entitled "Initial Transaction," wherein the information "Buy 25M MLFSX" is recorded. From reference to other portions of this document and the CMA brochure, this data means that $25,000 was to be invested in a government securities fund. As to the remaining $25,000, the document is silent. Mr. Van Kylen testified at a deposition that it was his understanding that the funds in the CMA were held in the form of government bonds. Adversary Deposition of Raymond R. Van Kylen at 34–35.

Mr. Van Kylen also testified that he believed Merrill Lynch, Inc. had possession of the bonds. *Id.* at 36–37. Because the certificated character of the investments in the CMA is a material fact, the perfection of the Bank's security interest is addressed as if certificates were not issued, *see infra* 465, and as if they were, *see infra* 465–69.

acknowledgment by a bank of receipt of money with an engagement to repay it"); 1987 Official Text of the Uniform Commercial Code: Reporter's Introductory Comment to 1977 Amendments, app. I at 813 (West 1987) ("The essential difference between a certificated and an uncertificated security ... is that the former is represented by an instrument, which may be treated as the property it represents, and the latter is not."). A security interest in instruments must be perfected by possession under section 409.305[7]. *See* WIS.STAT. § 409.304(1) (1987–88).

■ Under section 409.305, possession is accomplished when the collateral is physically transferred to the secured party or its agent, or to a bailee who has been notified of the secured party's interest.

Section 9–305 requires the secured party, his agent, or the bailee to have actual possession of the collateral in order to perfect his security interest. The debtor's lack of possession coupled with actual possession by the creditor, the creditor's agent or the bailee serves 'to provide notice to prospective third party creditors that the debtor no longer has unfettered use of [his] collateral.' *In re Copeland*, (D.Del.1975) 391 F.Supp. 134, 151. [other citations omitted].

*Heinicke Instruments*, 543 F.2d at 701–02; *see also Huffman v. Wikle (In re Staff Mort. & Inv. Corp.)*, 550 F.2d 1228, 1230 (9th Cir.1977) ("Under the Code, the only notice sufficient to inform all interested parties that a security interest in instruments has been perfected is *actual possession* by the secured party, his agent or bailee.") (emphasis supplied). The Bank does not contend that the contents of the CMA were ever actually transferred to it. Rather, the Bank appears to argue that Merrill Lynch, Inc. possessed the collateral either as an agent of the Bank or its bailee.

However, "[a]s the functional equivalent of filing, the secured party's taking possession of the collateral is adequate only if it puts third persons on notice that someone may claim an interest in the debtor's property." J. Worley, *Possessory Security Interests* § 14.03[1] at 14—13–14. Therefore, the putative agent for the secured party may not be too closely aligned to the debtor. As the Official Comment to section 9–305 states:

Possession may be by the secured party himself or by an agent on his behalf: it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party.

U.C.C. § 9–305 comment 2 (1977).

■ The secured party's control of the agent vis-a-vis the collateral must be exclusive of the debtor. *See* U.C.C. § 9–205 comment 6 (1977) ("Th[is] section does not mean that the holder of an unfiled security interest, whose perfection depends on possession of the collateral by the secured party or by a bailee ... can allow the debtor access to and control over the goods without thereby losing his perfected interest."). Any control exercisable by the debtor over the putative agent for the secured party defeats the secured party's claims to possession. The party in possession may not serve as the agent for both the debtor and the secured party. *Merchants Nat'l Bank v. Halberstadt*, 425 N.W.2d 429, 431 (Ia.Ct.App.1988); *Stein v. Rand Construction Co., Inc.*, 400 F.Supp. 944, 16 UCC Rep. 1150, 1154 (S.D.N.Y. 1975).

Under the agreed facts Merrill Lynch, Inc. does not qualify as an agent of the Bank for purposes of perfecting the Bank's security interest. Under Paragraph 2 of the Assignment Agreement, the Van Kylens were permitted to change the mix of

---

**7.** Because section 409.305 excludes instruments existing in the form of certificated investment securities from its scope, this provision is only applicable to the extent the funds were invested in certificates of deposit which were in the possession of the Bank at the time the Bank enforced its security interest. *See* WIS.STAT. § 409.305 (1987–88) ("A security interest is perfected by possession from the time possession is taken without relation back and *continues only so long as possession is retained*....") (emphasis supplied). As to any certificated securities, the Bank must rely on Article Eight's provisions relating to the perfection of security interests in investment securities. *See infra* 468–69.

investments in the CMA subject only to the requirements that: one, the investments be insured by the FDIC/FSLIC or be issued by the United States Government; and two, at least $50,000.00 worth of investments remain in the CMA at all times. The Van Kylens could effect a change in the investment mix by communicating their wishes to Merrill Lynch, Inc., who quite clearly was acting as their agent with respect to the CMA. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Boeck,* 127 Wis.2d 127, 145, 377 N.W.2d 605 (1985) (Abrahamson, J., dissenting) ("the nature of the relation between a customer who has a nondiscretionary account and the broker ... is one of principal and agent"). The degree of control the Van Kylens possessed over both the collateral and the putative agent renders the possession of the collateral by Merrill Lynch, Inc. inadequate to impart notice to third parties that the contents of the CMA were encumbered by the Bank's security interest. The Bank's argument that the title of the account would serve this notice function is simply unavailing. *See Greiner v. Wilke (In re Staff Mort. & Inv. Corp),* 625 F.2d 281, 283–84 (9th Cir.1980) (stapling security agreement to pledged notes did not serve notice function when neither secured party nor agent were in actual possession of the collateral).

The Bank also asserts that Merrill Lynch was a bailee, and that Merrill Lynch had notice of the Bank's security interest. The Bank provides little argument and no citation to authority in support of its assertion. There is no doubt that Merrill Lynch received notification of the Bank's security interest. The question is whether it held the contents of the CMA as a bailee within the meaning of section 409.305. This in-

quiry is slightly different than that undertaken in regard to Merrill Lynch's status as the agent of the Bank. One commentator distinguishes possession by agency from possession by a bailee with notice under section 9–305 in the following manner:

> The possession-by-agency technique contemplates the collateral being held or controlled by a party who is aligned with the secured party. The debtor delivers physical control of the collateral to the agent, and the agent's possession operates as the secured party's possession with the agent acting on behalf of th secured party. The bailee-with-notice technique, by contrast, contemplates the collateral being held or controlled by someone aligned (at least initially) *with the debtor.* The bailee presumably already has possession of the collateral by virtue of some pre-existing relationship with the debtor, and his receiving notification of the secured party's interest merely operates to transfer possession—albeit constructively—to the secured party.

J. Worley, *Possessory Security Interests* § 14.04[2][a][ii] at 14–48.[8]

In *In re Copeland,* 531 F.2d 1195 (3d Cir.1976) the court stated:

> Where the Code requires perfection by possession of the secured party or his bailee, it is clear that possession by the debtor or an individual closely associated with the debtor is not sufficient to alert prospective creditors of the possibility that the debtor's property is encumbered.... It does not follow ..., however, that possession of the collateral must be under the sole dominion and control of the secured party.... Rather, we believe that possession by a third party bailee, who is not controlled by the

**8.** At least one case appears to take a somewhat contrary position, holding that the a party standing in a bailment relation with the debtor may not qualify as a bailee under U.C.C. § 9–305. In *In re Milam,* 4 B.R. 621 (Bankr.M. D.Ga.1980), the debtor granted a security interest in a certain quantity of stock to a bank. The bank itself never took possession of the stock certificates; rather, the certificates remained in the possession of the issuer. The bank, relying on U.C.C. § 9–305 (1972 version), argued that

the since it had orally notified the issuer of the bank's security interest, the issuer was a "bailee with notice." The court disagreed stating:

> [U.C.C. § 9–305] is of no help to [the secured party] unless [the issuer] was the bailee of the [secured party], and the facts disclose that [the issuer] was the bailee of the debtor and not of the [secured party]. [The issuer] could not serve as bailee of both the debtor and the [secured party].

*Milam,* 4 B.R. at 622.

debtor, which adequately informs potential lenders of the existence of a perfected security interest satisfies the notice function underlying the 'bailee with notice' provision of § 9–305.

*Id.* at 1204. Thus, while the collateral need not be "under the sole dominion of the secured party," if the debtor can exercise control over the collateral while it is in the possession of the bailee, perfection is defeated. *Cf.* U.C.C. § 9–205 comment 6 (1977).

As discussed above, the Assignment Agreement permitted the Van Kylens freely to change the mix of investments in the CMA. The Van Kylens could accomplish this by the simple expedient of directing Merrill Lynch, Inc. to convert any particular investment into another form. Both Merrill Lynch, Inc. and the collateral were "under the control" of the Van Kylens.

Because of its general importance in bankruptcy law some comment is appropriate on *Hassett v. Blue Cross & Blue Shield of Greater N.Y. (In re O.P.M. Leasing Services, Inc.)*, 46 B.R. 661 (Bankr.S.D. N.Y.1985). There the debtor granted a security interest in $100,000.00 under an escrow agreement. The escrow agent was obligated to place the funds in an interest bearing account with a federally insured banking institution and to deliver to the debtor all interest earned on the funds. The escrow agent was also required to release the funds to the secured party upon the receipt of written notice that the debtor had defaulted. When the debtor filed bankruptcy, the trustee argued that the security interest was unperfected as the secured party was not in possession of the funds. The court held that the escrow agent was a "bailee with notice" under U.C.C. § 9–305, stating:

As the Escrow Agent was fully informed of [the secured party's] interest in the escrow account, and because the escrow agreement provided adequate notice to any subsequent creditors of [the debtor] that [the debtor] no longer had unfettered use of the funds in the escrow account, the Court is satisfied that delivery of possession to the Escrow Agent as custodian fully satisfied the perfection requirements of the U.C.C.

*O.P.M. Leasing,* 46 B.R. at 670.

*O.P.M. Leasing* is analogous to this case in that the debtors were restricted in their use of the collateral. There, the funds deposited were in the exclusive control of the escrow agent; here, the Van Kylens had to maintain $50,000.00 of value in the CMA. Additionally, in each case the security agreement seems sufficient to apprise subsequent creditors of the encumbrance of the collateral. There is, however, a distinguishing feature. In *O.P.M. Leasing* the collateral, a cash deposit, was static, *i.e.,* the debtor had no power to convert it into other forms of property. *See id.* at 668 ("The funds were not in control of [the debtor]."). In the present case, the Van Kylens could freely convert the government securities into shares in a money market fund, or various other investments. Further, there is nothing in the Assignment Agreement which prevents the Van Kylens from taking possession themselves of the instruments representing the investments made with the CMA funds. If that were done, a creditor dealing with the Van Kylens would not have the level of notice afforded one seeking to assert an interest in the OPM escrow.

■ The Bank's last stand on the issue of perfection is made under Article Eight. The Bank states in its brief:

Section 408.321(1) stats., provides that a security interest in a security is enforceable and can attach only if transferred to the secured party or person designated by him or [her] under 408.313(1), Stats. In this case, to the extent there were any securities making up the fund, Merrill Lynch, as agent for the Bank, had possession of the security, and therefore the security interest became perfected at that time.

Bank's Brief at 30. The Bank's rather truncated statutory argument is apparently as follows. Section 408.321(1) provides that a security interest in a security attaches when it is "transferred to the secured party or a person designated by him or her under s. 408.313(1)." WIS.STAT.

§ 408.321(1) (1987–88). Under section 408.-313(1)(a), the "transfer" of a security interest occurs when the secured party "or a person designated by him or her acquires possession of a certificated security." WIS.STAT. § 408.313(1)(a) (1987–88). Merrill Lynch, Inc. was so designated and had possession. Finally, section 408.321(2) provides that when a security interest "is so transferred pursuant to an agreement by a transferor who has rights in the security to a transferee who has given value [it] is a perfected security interest." WIS.STAT. § 408.321(2) (1987–88). The Van Kylens had rights in the investments and Merrill Lynch gave value. Therefore, to the extent the contents of the CMA contained certificated securities, the Bank held a perfected security interest.

Because the provision the Bank relies upon is the result of an amendment to Wisconsin's version of the U.C.C. occurring after the security interest was created, *see* 1985 Wisconsin Act 237 (adopting the "1977 Official Amendments" to the U.C.C.), the trustee argues that "retroactive" application of the provision is improper. I cannot adopt the trustee's argument. Application of the 1977 amendments to this transaction really does not have "retroactive" effect. No legal entitlements were changed. Prior to the amendments the security interest of a pledgee of a certificated security could have been perfected by possession. *See* WIS.STAT. § 409.302(1)(a) (1981–82); *id.* § 409.304(1); *id.* § 409.305. After the 1977 amendments, sections 408.313(1)(a) and 408.321(2) allow creation and perfection of security interests in the same manner. The requirements for prefection of the Bank's security interest are essentially identical under either statutory scheme:

> The typical pledge of a certificated security is unaffected by the [exclusion of certificated securities from section 9–305] since Section 8–313(1)(a) provides for transfer by delivery and Section 8–321(2) provides that a security interest thus transferred is perfected.

1987 Official Text of the Uniform Commercial Code: Reasons for 1977 Change § 9–305, app. I at 883 (West 1987). The 1977 Amendments do not change the result in this case.

Again assuming for purposes of disposing of the parties' cross motions for summary judgment that certificated securities were issued and were held by Merrill Lynch, Inc., the issue is whether Merrill Lynch, Inc. was acting as the Bank's "designee." I have found no cases which attempt to define "designee," but the commentary regarding the 1977 Amendments seems to argue in favor of construing it to mean "agent for purposes of possession;" *i.e.,* in the same manner as "agent" was construed under the old section 9–305. This seems faithful to the drafters' intent not to change the law with respect to security interests in certificated securities. If Merrill Lynch was not the Bank's agent before it is not now. The Bank, therefore, has failed to bring itself within either of the two exceptions to filing upon which it relies, and its security interest was unperfected.

■ The Bank, by the delivery of its February 19, 1987, letter notice of default to Merrill Lynch, Inc., properly enforced its security interest in the manner provided by paragraph 4 of the parties' security agreement. *See* WIS.STAT. § 409.501(1) (1987–88) ("When a debtor is in default under a security agreement, a secured party has the rights and remedies provided in ss. 409.501 to 409.507 and ... *those provided in the security agreement.*") (emphasis supplied). Under paragraph 5 of the Assignment Agreement, ownership of the funds in the CMA passed to the Bank to the extent of its security interest and the Van Kylens' rights were terminated. *See id.; see also id.* § 409.201 ("Except as otherwise provided by chs. 401 to 409 a security agreement is effective according to its terms between the parties...."). The trustee contends that this resulted in a preferential transfer under section 547(b), which provides:

> Except as provided in subsection (c) of this section, the trustee may avoid *any transfer of an interest of the debtor in property—*
>
> (1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title.

(emphasis supplied). All elements of a preference must be present for a transaction to be avoided under section 547(b). *Sullivan v. Willock (In re Wey)*, 854 F.2d 196, 198 (7th Cir.1988). The threshold inquiry is to what extent a "transfer of an interest of the debtor in property" occurred.

"Transfer" is defined in section 101(50) as:

every mode, direct or indirect, absolute or conditional, *voluntary or involuntary*, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption

(emphasis supplied). This expansive definition makes it clear that the involuntary termination of Mr. Van Kylen's rights in the CMA constituted a "transfer." *See Berge v. Sweet (In re Berge)*, 33 B.R. 642, 648 (Bankr.W.D.Wis.1983) (docketing of judgment of strict foreclosure terminated debtor's equitable interest in land contract and thus was a "transfer"); *see also Bundles v. Baker (In re Bundles)*, 856 F.2d 815, 817 n. 2 (indicating agreement with courts holding that foreclosure of security interest constitutes a "transfer" for purposes of section 548(a)). That the funds remained in the possession of Merrill Lynch, Inc. does not change the fact that enforcement of the Bank's security interest parted Mr. Van Kylen from his property. *Cf. Levit v. Ingersoll Rand Financial Corp. (In re V.N. Deprizio Construction Co.)*, 86 B.R. 545, 551 (N.D.Ill.1988) (court states that it is incorrect to "view[ ] transfers from a creditor's point of view.... the Code defines 'transfer' from a payer's point of view.").

The phrase "interest of the debtor in property" is not defined in the Code. *Danning v. Bozek (In re Bullion Reserve of N.A.)*, 836 F.2d 1214, 1217 (9th Cir.1988). Because all legal and equitable interests of the debtor become property of the estate upon the filing of a bankruptcy petition, courts have looked to the definition of "property of the estate" found in section 541(a) to determine the extent of the debtor's property interests for purposes of section 547(b). *See, e.g., Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1279 n. 8 (8th Cir.1988); *Elliott v. Frontier Properties (In re Lewis Shurtleff, Inc.)*, 778 F.2d 1416, 1419 (9th Cir. 1985). Reference to section 541(a) is consonant with the principle that section 547 is intended to protect the debtor's estate, and thus the distribution to unsecured creditors, from diminution. *General Office Furniture Wholesalers, Inc. v. U.S. Furniture, Indust., Inc. (In re General Office Furniture Wholesalers, Inc.)*, 42 B.R. 232, 235 (Bankr.E.D.Va.1984). *See also Mandross v. Peoples Banking Co. (In re Hartley)*, 825 F.2d 1067, 1070 (6th Cir.1987). Under either section, the court must look to the characterization of Mr. Van Kylen's interest in the CMA under state law. *See Bethlehem Steel Corp. v. Tidwell*, 66 B.R. 932, 935 (M.D.Ga.1986). *See also Kallen v. Ash, Anos, Freedman & Logan (In re Brass Kettle Restaurant, Inc.)*, 790 F.2d 574, 575 (7th Cir.1986) ("We look to state law to determine whether property is an asset of debtor.").

Prior to February 19, 1987, Mr. Van Kylen and Mrs. Van Kylen owned the CMA in joint tenancy with right of survivorship.

The document executed when the CMA was opened entitles the account the "Raymond R. Van Kylen and Lillian S. Van Kylen, JTWROS, Assignment Account." While the denomination of such an account is not determinative, *see First Wisconsin Trust Co. v. United States*, 553 F.Supp. 26, 30 (E.D.Wis.1982) (creation of joint tenancy in brokerage account), it is evidence of the intent of the Van Kylens to create a joint tenancy in the CMA, *see id.; cf.* WIS.STAT. § 700.19(1) (1987–88) ("The creation of a joint tenancy is determined by the intent expressed in the document of title, instrument of transfer or bill of sale."). Additionally, the funds initially deposited in the CMA were proceeds from an asset held in joint tenancy. There is no evidence to rebut the presumption of joint tenancy raised by these facts.[9]

As a joint tenant, Mr. Van Kylen held an equal, undifferentiated share in the entire CMA until the enforcement of the Bank's security interest. *See Bonnell v. Bonnell*, 117 Wis.2d 241, 247, 344 N.W.2d 123 (1984); *cf.* WIS.STAT. § 700.17(2) (1987–88) ("Each of two or more joint tenants has an equal interest in the whole property for the duration of the tenancy, irrespective of unequal contributions at its creation."). As a joint tenant, Mr. Van Kylen could not have uni-laterally appropriated more than his proportionate share without effecting a severance of the joint tenancy, the termination of his survivorship rights in Mrs. Van Kylen's interest, and the incurrence of an obligation to account for one-half of funds in the CMA. *See First Wisconsin Trust Co.*, 553 F.Supp. at 30; *Estate of Kohn*, 43 Wis.2d 520, 526, 168 N.W.2d 812 (1969); *Estate of Gray*, 27 Wis.2d 204, 210–11, 133 N.W.2d 816 (1965); *Estate of Schley*, 271 Wis. 74, 81, 72 N.W.2d 767 (1955). Likewise, the voluntary or involuntary conveyance of Mr. Van Kylen's interest would have severed the joint tenancy. *See Nichols v. Nichols*, 43 Wis.2d 346, 349, 168 N.W.2d 876 (1969) ("sale or partition severs the joint tenancy and creates a tenancy in common"); *Estate of King*, 261 Wis. 266, 273, 52 N.W.2d 885 (1952) ("joint tenancy may be severed by court action, as by … a sale upon execution of a judgment").

Therefore, under state law the "interest of the debtor in property" transferred on February 19, 1987, was no greater than Mr. Van Kylen's proportionate share in the CMA, or one-half of the funds. Only to this extent was Mr. Van Kylen's subsequently created bankruptcy estate diminished by the transfer.[10] The trustee's

---

**9.** The Van Kylens' interests in the CMA were not affected by the passage of Wisconsin's Marital Property Act. *See* Wisconsin Marital Property Act, 1983 Wisconsin Act 186 (codified at WIS. STAT. §§ 766.001–.97 (1987–88)). Under the Marital Property Act, "[a]11 property of spouse is presumed to be marital property." WIS. STAT. § 766.31(2) (1987–88). This general rule, however, is qualified by the exception for "predetermination date" property:

Except as provided otherwise in this chapter, the enactment of this chapter does not alter the classification and ownership rights of property acquired before the determination date or the classification and ownership rights of property acquired after the determination date in exchange for or with the proceeds of property acquired before the determination date.

WIS.STAT. § 766.31(8) (1987–88). The "determination date" is defined as:

the last to occur of the following:
(a) Marriage.
(b) 12:01 a.m. on the date that both spouses are domiciled in this state.
(c) 12:01 a.m. on January 1, 1986.

WIS.STAT. § 766.01(5) (1987–88). Since Mr. and Mrs. Van Kylen were married and living in Wisconsin before January 1, 1986, that date is the "determination date" for the Van Kylens. The creation of the CMA occured in the fall of 1984, considerably prior to January 1, 1986. Therefore, the enactment of the Marital Property Act does not alter the "classification and ownership rights" of the Van Kylens in the CMA. WIS.STAT. § 766.31(8) (1987–88).

Because the CMA was not marital property under state law, it would not have been "community property" within the meaning of 11 U.S. C. § 541(a)(2). *See In re Fisher*, 67 B.R. 666, 668 (Bankr.D.Colo.1986). Therefore, Mrs. Van Kylen's interest in the CMA would not have passed into her husband's bankruptcy estate under Bankruptcy Code section 541(a)(2) had the transfer to the Bank not occurred.

**10.** This is so whether or not one takes the view that, but for the transfer, the filing of the bankruptcy petition would have severed the joint tenancy. *Compare In re Blodgett*, 115 F.Supp. 33, 35 (E.D.Wis.1953) (upon filing, bankruptcy trustee is vested with title to the bankrupt's interest in joint tenancy property; thus, "[t]he joint tenancy between the bankrupt and his spouse has been severed, and the trustee and the

avoidance power under section 547(b) is thus limited to one-half the property transferred, or $25,000.00.

As to the other elements of section 547(b)(1), the court's holding that the Bank's security interest was unperfected resolves the only remaining issue; to wit, whether the transfer enabled the Bank to receive more than it would have if the transfer had not been made. But for the transfer, the Bank would have lost its lien under section 544(a)(1) and stood as an unsecured creditor. There is no dispute that the Bank received more from the February 19th transfer than it would have on account of its unsecured claim. Therefore, the transfer of Mr. Van Kylen's interest in the CMA to the Bank is avoided and pursuant to section 551 is preserved for the benefit of the estate.

### ORDER

The court having this day entered its memorandum decision in the above-entitled matter,

IT IS HEREBY ORDERED that Lillian S. Van Kylen's motion for summary judgment is denied;

IT IS FURTHER ORDERED that the trustee's motion for summary judgment is granted in part and the trustee is entitled to one-half of the funds currently held in escrow by Merrill Lynch, Inc. for the benefit of the parties;

IT IS FURTHER ORDERED that Citizen State Bank's motion for summary judgment is granted in part and the Bank is entitled to the remaining one-half of the funds currently held in escrow by Merrill Lynch, Inc.

---

bankrupt's spouse each have a half interest in the property as tenants in common"); *Flynn v. O'Dell,* 281 F.2d 810, 817 (7th Cir.1960); *In re Tyson,* 48 B.R. 412, 414 (Bankr.C.D.Ill.1985); *Feldman v. Panholzer (In re Panholzer),* 36 B.R. 647, 651 (Bankr.D.Md.1984); *In re Lambert,* 34 B.R. 41, 43 (Bankr.D.Colo.1983) *with Harkins v. Oswald (In re Oswald),* 90 B.R. 218, 221 (Bankr. N.D.W.Va.1988) (trustee succeeds to debtor's joint tenancy interest); *In re Spain,* 85 B.R. 874, 877 (Bankr.N.D.Ala.1988); *In re Anthony,* 82 B.R. 386, 388 (Bankr.W.D.Pa.1987). Despite the difference between the forms of ownership, *see Bonnell v. Bonnell,* 117 Wis.2d at 247–48, 344 N.W.2d 123, whether as a joint tenant or a tenant in common (barring the death of either Mr. or Mrs. Van Kylen), the bankruptcy estate's interest would be limited to Mr. Van Kylen's proportionate share in the CMA, or one-half the funds, *see id.; cf.* 11 U.S.C. § 363(h)–(j) (trustee may sell both the estate's interest and the interest of any co-owner in property in which the debtor had, at the commencement of the case, an undivided interest as a tenant in common or joint tenant, and must distribute proceeds to estate and co-owners in accordance with their respective interests).