**FIRST TENNESSEE BANK NATIONAL ASSOCIATION, Plaintiff,**

v.

**TRUSTMARK NATIONAL BANK, Defendant.**

**CIV.A.No. 3:99CV859LN.**

United States District Court, S.D. Mississippi, Jackson Division.

Oct. 5, 2000.

Sheryl M. Bey, Tiffanee Nicole Wade, Baker, Donelson, Bearman & Caldwell, Jackson, MS, for Plaintiff.

Christopher A. Shapley, Greenville Tate, Jr., William "Trey" E. Jones, III, Brunini, Grantham, Grower & Hewes, Jackson, MS, for Defendant.

## MEMORANDUM OPINION AND ORDER

LEE, District Judge.

This cause is before the court on the supplemental motion of defendant Trustmark National Bank for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Plaintiff First Tennessee Bank National Association (First Tennessee) has responded in opposition to the motion and the court, having considered the memoranda of authorities submitted by the parties, concludes that the motion is well taken and should be granted.

■ On December 3, 1999, First Tennessee, a national banking association with its principal offices located in Memphis, Tennessee, filed its original complaint in this cause against Trustmark, a national banking association with its principal offices located in Jackson, Mississippi, demanding damages from Trustmark in the amount of $1,055,000, plus interest, costs and expenses, based on Trustmark's alleged wrongful release of certain securities in which First Tennessee had a valid and perfected security interest. According to the complaint, beginning in 1996, First Tennessee had made certain loans and extended credit to Roxco, Ltd., a Mississippi construction firm, relative to which Roxco executed a security agreement granting First Tennessee a security interest in a

variety of collateral, including Roxco's equipment, inventory, accounts, receivables, contract rights and "general intangibles" and any proceeds therefrom. In connection with this security agreement, First Tennessee filed financing statements describing these same categories of collateral. In April 1999, following Roxco's default on its loan obligations to First Tennessee, First Tennessee sent a letter to Trustmark, which held certain "securities and funds" owned by Roxco in the amount of $1,055,000, advising that this property was subject to First Tennessee's security agreement with Roxco and its perfected security interest in the collateral. Rather than release the securities to First Tennessee, however, Trustmark released the securities to the State of Mississippi, which had also claimed a right to the securities, maintaining, as it did, that the securities held by Trustmark constituted retainage to which the State, as owner of a number of projects on which Roxco had defaulted in its performance obligations, was by law entitled.[1]

On May 11, 2000, after Trustmark filed a motion for judgment on the pleadings asserting entitlement to judgment on the basis that First Tennessee never acquired or perfected a security interest in the securities released by Trustmark to the State, First Tennessee filed an amended complaint, including both its original allegation that it had obtained a perfected security interest in the securities and an additional allegation that it is entitled to damages for the wrongful release of secu-

rities based on certain rights which Roxco had to the securities and on Roxco's transfer of those rights to First Tennessee via the security agreement. Once the amended complaint was filed, Trustmark filed a supplemental motion for judgment on the pleadings which has now been fully briefed by the parties.

Trustmark insists in its motion that it is entitled to judgment on the pleadings inasmuch as the substance of the pleadings discloses that First Tennessee asserts a right to property in which it never acquired an enforceable, perfected security interest. That is, Trustmark maintains that First Tennessee cannot succeed on its claim in this case because First Tennessee failed to comply with the attachment and perfection procedures specifically required for security interests in investment property, including securities. The court agrees.

Under the 1978 version of the UCC, which was applicable in Mississippi at the time First Tennessee allegedly obtained its security interest, a security interest in investment property could attach and be perfected only if the security was "transferred to the secured party or a person designated by" the secured party in accordance with the methods of transfer set forth in Miss.Code Ann. § 75–8–313(1). *See* Miss.Code Ann. § 75–8–321(1) ("A security interest in a security is enforceable and can attach only if it is transferred to the secured party or a person designated by him pursuant to a provision of Section 75–8–313(1)."). With respect to uncertifi-

---

1. As the parties note, a project owner is typically entitled to retain a certain percentage of progress payments made to a contractor. This retained percentage, or retainage fund, is held until completion of the project in order to ensure full and adequate performance by the contractor. If the contractor defaults prior to completion, the project owner may use the retainage fund to pay for labor and mate-rials necessary to complete the contract. *See Canton Exchange Bank v. Yazoo County*, 144 Miss. 579, 109 So. 1 (1926). Under Miss. Code Ann. § 31–5–15 (Supp.1999), the general contractor in public construction contracts is authorized to deposit securities with the Statute Treasurer and thereby obtain release of retainage. *See infra* note 5.

cated securities, the relevant version of Miss.Code Ann. § 75–8–313(1) provided that the "transfer" of a security interest—which, to reiterate, was required for attachment and perfection—could be accomplished in one of the following seven ways: [2]

(1) The secured party could become the registered owner of the securities, § 313(1)(b);

(2) A financial intermediary could send the secured party confirmation of the pledge and enter the pledge of the securities on its books, § 313(1)(d);

(3) A third person, not a financial intermediary, who was the registered owner, could acknowledge that he held the securities for the secured party, § 313(1)(f);

(4) The transfer could be entered on the books of a clearing corporation, § 313(1)(g);

(5) The debtor could sign a security agreement containing a description of the security, and if so, then written notification signed by the debtor (which may be a copy of the security agreement) could be sent to a financial intermediary on whose books the interest of the transferor in the security appeared;

(6) Automatic perfection was possible for 21 days after new value was given

under a security agreement, § 313(1)(i); and

(7) A financial intermediary which controlled the uncertificated security could become a secured party by giving value and obtaining a security agreement describing the security, § 313(1)(j).

In this case, Trustmark argues that of these, the only relevant method by which First Tennessee could have obtained an enforceable, perfected security interest in the securities would have been if Trustmark received "written notification" signed by the debtor, of the security interest, as provided by § 75–8–313(1)(h).[3] Trustmark submits, however, that this method was not accomplished for two reasons. First, although First Tennessee did purport to give Trustmark notice of its claimed security interest, it did so long after the securities had been substituted for retainage pursuant to Miss.Code Ann. § 31–5–15 and after the 1996 revisions of Articles 8 and 9 eliminated "notification" as a method of attachment/perfection of securities. Second, First Tennessee failed to adequately describe the securities in the security agreement and financing statements and consequently, no security interest in the subject securities ever attached or was perfected.[4]

---

**2.** The court notes First Tennessee's argument that "examination of the perfection issue must await further development of the facts" since "it is unclear at this stage of the litigation whether the Treasury bills at issue here were, in fact, merely book-entry, uncertificated items." Aside from the questionable relevance of this assertion, the court notes, as does Trustmark, that plaintiff's own exhibits to the amended complaint, and in particular safekeeping receipts issued by Trustmark to Roxco, disclose that the securities at issue were "book entry" and hence uncertificated.

**3.** That is because First Tennessee was not the registered owner of the securities; Trustmark did not send confirmation of the pledge to First Tennessee and enter the pledge on its

books; and because the methods of attachment and perfection described in subsections (f), (g), (i) and (j) are not applicable for purposes of this transaction.

**4.** First Tennessee argues in its response memorandum that the securities were not actually substituted as retainage and that for this reason, and others, the State had no interest in the securities. However, unless First Tennessee had an enforceable interest in the securities, it lacks standing to complain that the securities were improperly released to another who might also have lacked an enforceable interest. Cf. *Oldham v. Fortner*, 221 Miss. 732, 740, 74 So.2d 824, 827 (1954) (recognizing in action to quite title that the plaintiff asserting a right to property must rely on the

■ The court does not find Trustmark's argument on the first of these points necessarily persuasive. The court is somewhat dubious of Trustmark's conclusion that the securities at issue were actually substituted as retainage as provided for by Miss.Code Ann. § 31–5–15.[5] Moreover, while the 1996 version of Mississippi's UCC may have eliminated notification of the secured party's interest in an uncertificated security as a means of transfer, i.e., attachment/perfection, that same version provided for filing as a method of perfection, *see* Miss.Code Ann. § 75–9–115(b) ("Except as otherwise provided in paragraphs (c) and (d), a security interest in investment property may be perfected by filing."); and filing is the method of perfection chosen by First Tennessee.[6] Whether under such circumstances, an original filing might have sufficed as a means of perfection, assuming, that is, that the content of the security agreement and financing statement was otherwise adequate, in the case at bar, that issue is ultimately of no consequence since in the court's opinion, a security interest in the

strength of his own title and not upon the weakness of the title of others).

5.  Miss.Code Ann. § 31–5–15 provides:

    [A] contractor may, with the written consent of his or its surety, from time to time, withdraw the whole or any portion of the amount retained from payments due the contractor pursuant to the terms of the contract by depositing with the State Treasurer of the State of Mississippi ... [certain] securit[ies], or any combination thereof in an amount equal to or in excess of the amount so withdrawn, said securities to be accepted at the time of deposit....

    The State Treasurer, or the secretary or treasurer of the political subdivision holding said security, shall, from time to time, collect all interest or income on the security so deposited and shall, by and with the written consent of contractor's surety, pay the same when and as collected to the contractor or contractors who deposited said obligations. If the deposit be in the form of coupon bonds, the coupons as they respectively come due shall be delivered to the contractor.

    \*    \*    \*    \*    \*    \*

    In the event the contractor shall default in the performance of the contract or any portion thereof, the securities deposited by him in lieu of retainage and all interest and coupons and income accruing on said securities after said default may be sold by the state or any agency or department thereof, or any political subdivision, and the proceeds of said sale used as if such proceeds represented the retainage provided for under the contract.

The court is aware of nothing in the record to suggest that this is what occurred here. Rather, as First Tennessee points out, the securities here were deposited for safekeeping with Trustmark, not the State Treasurer; they were not deposited in an account belonging to the State, despite the fact that such an account apparently existed; and Roxco, according to First Tennessee, is listed as the owner of record on the safekeeping receipts issued by Trustmark, which reflect that the securities "were received for your account, subject to your instructions."

6.  The court is, of course, aware that the transition rules which took effect when the 1996 version went into effect, provided that "[i]f a security interest in a security is perfected at the date this act takes effect by the action by which the security interest was perfected would not suffice to perfect a security interest under this act, the security interest remains perfected for a period of four (4) months after the effective date and continues thereafter if appropriate action to perfect under this act is taken within that period." *See* Laws, 1996, ch. 468, § 72 (1996). Although First Tennessee took no additional action to perfect within four months of the act's taking effective, such as refiling, that same rule also provided that,

    if a security interest in a security is perfected at the date this act takes effect, and the action by which the security interest was perfected would suffice to perfect a security interest under this act, no further action is required to continue perfection.

    *Id.*

securities never attached.[7]

■■■ The security agreement executed by Roxco in favor of First Tennessee contains no mention of securities—either securities in general, particular securities or categories of securities. And while the agreement does purport to grant First Tennessee a security interest in, *inter alia,* Roxco's "general intangibles", in the court's opinion, the securities do not come within that description. *See* James J. White & Robert S. Summers, *Uniform Commercial Code* § 31–12(a) (4th ed.1995) (prior to the 1978 revisions to Article 8, investment securities were classified as either instruments or general intangibles, but the 1978 version of Article 8 removed investment securities from the scope of Article 9); Barkley Clark, *The Law of Secured Transactions Under the Uniform Commercial Code* § 14.02[3] (revised ed.1999) (noting that securities were no longer classified as general intangibles after the enactment of the 1978 version of Article 8); *see also In re Googel,* 130 B.R. 126, 128 and n. 5 (Bankr.Conn.1991) (holding that requirement that security agreement contain "a description of the security" for attachment and perfection not satisfied by phrase "any other property," and rejecting notion that "an adequate description of the 'collateral' under Article 9 would necessarily serve as an adequate description of the 'security' under Article 8, where the latter term is more narrowly defined.").[8] The 1978 version of Article 8 "contain[ed] no guidance on the type of description required," but "the analogous requirement under Article 9," set forth in § 9–110, "provide[s] that 'any description of personal property or real estate is sufficient whether or not it

---

7. First Tennessee argues that the issue of perfection is "wholly irrelevant" since the State, having failed to comply with Miss.Code Ann. § 31–5–15, was at best an unsecured creditor of Roxco, while First Tennessee, whether or not its interest was perfected, was a secured creditor with priority over all unsecured creditors. The court, though, for reasons explained in the text, is of the opinion that First Tennessee did not have a security interest, perfected or unperfected, in the subject securities.

8. The court notes that the description here involved would also be insufficient to create an enforceable security interest in the subject securities under the revisions to Articles 8 and 9, which became effective in Mississippi July 1, 1996, i.e., after the security agreement was executed. Under Miss.Code Ann. § 75–9–115(3),

> A description of collateral in a security agreement or financing statement is sufficient to create or perfect a security interest in a certificated security, uncertificated security, security entitlement, securities account, commodity contract, or commodity account whether it describes the collateral by those terms, or as investment property, or by description of the underlying security,

financial asset, or commodity contract. A description of investment property collateral in a security agreement or financing statement is sufficient if it identifies the collateral by specific listing, by category, by quantity, by a computational or allocational formula or procedure, or by any other method, if the identity of the collateral is objectively determinable.

*See also* Miss.Code Ann. § 75–9–105(1)(h), § 75–9–105(1)(i) and § 75–9–106 (expressly excluding investment property from definitions of "goods," "instruments" and "general intangibles"). It cannot reasonably be said that the description of collateral in First Tennessee's security agreement with Roxco is sufficient to create a security interest in the securities at issue. The identity of the securities is not "objectively determinable" from the description in the security agreement.

In this regard, the court would also note that it does not understand it to be Trustmark's contention that Mississippi essentially abrogated the term "general intangible" by the 1996 revisions to the UCC or that First Tennessee's alleged security interest somehow unattached. Rather, as the court comprehends its memoranda, Trustmark contends that "general intangibles" was an insufficient description under both the 1978 and 1996 versions of the UCC.

is specific if it reasonably identifies what is described.'" *In re Clinton Hosp. Ass'n,* 142 B.R. 601, 604 (Bankr.D.Mass. 1992). The description in the security agreement does not reasonably identify the securities. Accordingly, no interest in the securities attached.[9]

■ First Tennessee contends, though, that even if that is the case, it nevertheless may prevail against Trustmark since its rights under the security agreement extended beyond the securities themselves to Roxco's account which held the securities. Thus, it argues, Trustmark's release of the securities to the State in derogation of First Tennessee's interest constituted conversion, even without regard to the attachment or perfection of its claimed security interest in the securities themselves. The court rejects this contention, which is, as

Trustmark notes, nothing more than an attempt to make an end-run around the express statutory requirement for attachment of a security interest in the securities. In the court's opinion, even assuming arguendo that the description in the security agreement was sufficient to cover Roxco's account, compliance with the transfer provisions of § 75-8-313 was still required for a security interest in the underlying securities to attach. Indeed, First Tennessee has offered no authority for the proposition that simply by obtaining an interest in a securities account, it thereby obtained a valid security interest in the underlying securities without following the applicable rules regarding transfer of the securities.[10]

■ As an alternative basis for proceeding against Trustmark for damages for the

9. In response to Trustmark's motion, First Tennessee argues that Trustmark has "blur[red] the distinction between attachment and perfection," suggesting that less is required for a security interest in investment property to attach than is needed for the secured party to perfect its interest. However, the blurring of this distinction is not by Trustmark but by the Code itself. *See* White and Summers, § 31–12, at 164 (4th ed. 1995) ("Once there is an 'effective transfer' under § 8–313, a security interest has attached and is 'enforceable' under the terms of § 8–321(1). As the comment and heading to that section show, 'enforceable' means 'perfected'—with the exceptions mentioned in 8–321. Thus, transfer under 8–313 normally equals attachment and perfection."); *see also* David I. Cisar & Steven C. Turner, *Revised UCC Article 8 and Security Interest in Investment Securities,* 14 Am. Bankr.Inst. J. 20, at *1 (Dec./Jan.1996) ("[A] security interest in a security attaches when the security is transferred to the secured party. The security interest is perfected by the transfer. There is little or no distinction between 'attachment' and 'perfection.' ").

10. This conclusion cannot be drawn from the two cases cited by First Tennessee, for in neither case did the court purport to consider

this issue. The court in *In re Nix,* 864 F.2d 1209, 1211 (5th Cir.1989), held only that a Keogh retirement plan was a "general intangible" to which a security interest under Article 9 could attach. In *In re Van Kylen,* 98 B.R. 455, 464 (Bankr.W.D.Wis.1989), the court opined that a cash management account which contained, *inter alia,* uncertificated securities, was a general intangible, and that the creditor's failure to file a financing statement was fatal to the perfection of its claimed interest in the account. As in *In re Nix,* the court did not address whether compliance with the transfer rules would be required for an interest in the securities to attach and/or be perfected irrespective of the attachment and/or perfection of an interest in the account. This court would note, though, that in *In re Van Kylen,* the security agreement signed by the debtor described both the account ("[the Van Kylens] do[ ] hereby assign to [the Bank], solely as collateral . . ., all of their rights, title and interest in the cash account up to $50,000"), and the underlying securities ("All amounts in the Cash Account up to $50,000 shall be in instruments, documents, securities or other similar items which are either insured by FDIC/FSLIC or are issued by the United States Government."), *and* the custodian of the account was given notice of the claimed security interest.

alleged conversion of the securities, First Tennessee submits that Roxco did not merely grant it a security interest in the securities, but went much further, and appointed it as Roxco's attorney-in-fact and authorized First Tennessee to file any claims or take any action necessary to enforce its rights in the securities held by Trustmark. First Tennessee thus asserts, in its putative capacity as Roxco's attorney-in-fact, that Trustmark's release of the securities to the State was wrongful and in violation of Roxco's interest, since most, if not all of the retainage was due Roxco. This argument, however, ignores the fact that the "attorney-in-fact" provision in the security agreement relates solely to collateral actually covered by the security agreement and in which First Tennessee had an enforceable security interest.[11] And since the court has concluded that the security agreement did not create an enforceable security interest in the securities, the "attorney-in-fact" provision avails First Tennessee nothing.

For these reasons, the court concludes that Trustmark's motion for judgment on the pleadings should be, and is hereby granted.

A separate judgment will be entered in accordance with Rule 58 of the Federal Rules of Civil Procedure.

---

11. The security agreement recites, in relevant part, [Roxco] ... appoints [First Tennessee] [Roxco's] attorney-in-fact and proxy, with full authority in the place and stead of [Roxco] ... to take any action and to execute any instrument which [First Tennessee] may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation ... to ask, demand, collect, sue for, recover, compound, receive, and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral; ... to file any claims or take any action or institute any proceedings which [First Tennessee] may deem necessary or desirable for the collection of any of the Collateral of otherwise to enforce the rights of [First Tennessee] with respect to any of the Collateral.... The powers conferred on [First Tennessee] hereunder are solely to protect its interest in the Collateral....